UNITED STATES of America

v.

Carlos MARCELLO et al.

Crim. A. No. 80–274.

United States District Court,
E. D. Louisiana.

Jan. 9, 1981.

John P. Volz, U. S. Atty., E. D. La., L. Eades Hogue, U. S. Dept. of Justice, Albert Winters, Richard T. Simmons, Asst. U. S. Attys., John Voorhees, U. S. Dept. of Justice, New Orleans, La., for United States.

Russell J. Schonekas, New Orleans, La., Henry Gonzalez, Tampa, Fla., for Marcello.

Thomas R. Dyson, Jr., Washington, D. C., Frank DeSalvo, New Orleans, La., for Davidson.

Michael S. Fawer and Matthew H. Greenbaum, New Orleans, La., for Roemer.

Arthur A. Lemann, III, New Orleans, La., for Marinello.

Risley Triche, Napoleonville, La., for Young.

SEAR, District Judge.

## I. *Introduction*

Defendants in a government prosecution resulting from the Justice Department's undercover "sting" operation code-named "BRILAB" have brought various pretrial motions to dismiss the indictment against them or, failing that, to suppress certain evidence which they contend was illegally obtained. The defendants first move to dismiss the indictment because of what they

characterize as governmental overreaching and jurisdiction artificially created by the government. They also contend in these motions that prejudicial publicity resulting from leaks to the news media of grand jury proceedings is so pervasive that they are entitled to dismissal of the indictment. In addition, defendant Carlos Marcello seeks dismissal on the ground that he is a victim of arbitrary and discriminatory selective prosecution. In the second group of motions, defendants seek suppression of their recorded communications obtained by the government with the consent of an informer, Joseph Hauser, or pursuant to wiretap orders issued by United States District Judges in the District of Columbia and the Eastern District of Louisiana. In addition to the motions to suppress, the second group of motions includes one brought by Marcello for disclosure of the name of the individual who provided the government with confidential notebooks and telephone logs allegedly stolen from him in a 1977 burglary.

Arguments on the motions to dismiss and other preliminary motions[1] were heard on October 6 and 7, 1980. At that time rulings on some of these motions were deferred until the trial or following any post-trial hearings that might be necessary. During the week of December 8, 1980, extensive evidentiary hearings were held on the motions to suppress and defendant Marcello's motion for disclosure. Because of the number of motions, the uniqueness of some, and the necessity of maintaining an orderly record, there is a need to explain my rulings on the motions to suppress and the motion for disclosure, as well as to elaborate on my prior rulings on the motions to dismiss.

## II. Background of the Case

On June 17, 1980, defendants Carlos Marcello, I. Irving Davidson, Vincent Marinello, and Charles Roemer were indicted by a federal grand jury in the Eastern District of Louisiana. A fifth defendant, Aubrey Young, was added as a defendant in a superseding indictment issued by the grand jury on August 14, 1980. In the lengthy, twelve-count indictment, the defendants are charged with various violations of federal law allegedly uncovered in a Justice Department undercover operation commonly known as BRILAB. The investigation, whose acronym stands for "bribery-labor," centered upon suspected illegal activities involving public officials, labor unions and reputed organized crime figures in the Southwest. The BRILAB operation in Louisiana lasted about one year from February 1979 to February 1980, a period during which the 1979 Louisiana gubernatorial campaign and election were held. As part of the investigation, two FBI agents posed as representatives of a fictitious Beverly Hills, California firm called Fidelity Financial Consultants. The agents were aided by Joseph Hauser, a cooperating individual who had pleaded guilty on February 5, 1979 to federal charges arising out of his involvement in an insurance swindling scheme.

In this prosecution defendants are charged with involvement in a criminal enterprise for the purpose of obtaining insurance contracts from state and local governments, labor unions, and at least one private business by committing various criminal acts. In general the defendants are charged with (1) a conspiracy to obtain insurance contracts by committing criminal acts in violation of the Racketeer Influenced and Corrupt Organizations (RICO)

---

1. Prior to the hearing conducted the week of October 6, 1980, and again before the hearings held the week of December 8, 1980, the defendants moved to adopt the substantive motions and the motions to suppress of their co-defendants, and I granted the motions to adopt. In addition to the motions discussed in the text of this minute entry, the defendants brought various motions in October to dismiss the indictment and to strike portions of the indictment. I denied these motions orally from the bench.

Motions for review of the discovery orders issued by United States Magistrate Ingard O. Johannesen were also argued and decided at the October hearings. *See* Minute Entry filed November 4, 1980. In addition, defendants Charles Roemer, I. Irving Davidson, Vincent Marinello and Aubrey Young argued that their prosecutions should be severed from the trial of defendant Carlos Marcello. I denied the motions to sever orally from the bench.

Act, 18 U.S.C. § 1962(c); (2) a substantive violation of RICO, 18 U.S.C. § 1961(4), in that the defendants were allegedly "associated in fact" as an "enterprise" to obtain insurance contracts by committing criminal acts; (3) violations of the federal mail fraud statute, 18 U.S.C. § 1341; (4) violations of the federal wire fraud statute, 18 U.S.C. § 1343; and (5) interstate travel or transportation in aid of racketeering in violation of 18 U.S.C. § 1952.

## III. *Motions to Dismiss*

Among the motions argued by the defendants on October 6 and 7, 1980 were four whose determination they contend requires extensive evidentiary hearings. First, the defendants seek to dismiss the indictment on grounds of "governmental overreaching" and prosecutorial misconduct. They contend that the acts charged in the indictment were all part of a scheme initiated, controlled, planned and executed by the government itself in violation of their constitutional rights to due process of law. Second, the defendants submit that the indictment should be dismissed because federal criminal jurisdiction was artificially created by the government, which they argue concocted, created and supplied the interstate commerce aspects necessary to allege a federal offense. Third, defendant Marcello seeks to dismiss the indictment as to him on grounds that the government engaged in discriminatory selective prosecution. Marcello contends that for years government prosecutors have arbitrarily labeled him as chief of a Louisiana organized crime syndicate and boss of the "Mafia" or "La Cosa Nostra." Marcello argues that this false label prompted the government to create the scheme charged in the indictment for the express purpose of fraudulently inducing Marcello in particular into the scheme in violation of his Fifth and Fourteenth Amendment rights to due process and equal protection of the law. Finally, defendants seek dismissal of the indictment on grounds that they were severely prejudiced by government-initiated leaks to the press. They contend that these leaks enabled newsmen to write and broadcast reports about the pending BRILAB grand jury investigation creating unfair and prejudicial pre-indictment and pre-trial publicity which rendered further proceedings fundamentally unfair. Alternatively, the defendants ask that the government officials responsible for the news leaks be held in contempt pursuant to Fed.R.Crim.Pro. 6(e).

Each of these motions contemplates a broad evidentiary hearing at which the defendants would examine government officials, witnesses and documents in hopes of establishing prosecutorial misconduct so egregious that the resulting indictment must be dismissed as a violation of defendants' constitutional rights. In anticipation of the contemplated evidentiary hearings, the defendants subpoenaed the Attorney General of the United States, one of his chief deputies, the director of the FBI and one of his assistants, United States attorneys, FBI agents, and the government's chief witness and informer, Joseph Hauser. In addition, they subpoenaed members of the press whose news stories appeared prior to and during the grand jury investigation and which defendants contend prejudiced them.

### A) *Governmental Overreaching and Artificially Created Jurisdiction*

The motions alleging governmental overreaching and artificially created jurisdiction share a common legal basis and require substantially similar proof. For each of these motions, defendants seek an evidentiary hearing to elicit the testimony of government officials and informers who were involved in the BRILAB investigation or its supervision. The threshold issue in the resolution of these motions is whether claims of governmental misconduct and artificially created jurisdiction present cognizable defenses to a criminal prosecution. I find that each does.

Ordinarily, a criminal defendant's allegation of governmental overreaching or prosecutorial misconduct arises in the defense of entrapment. When a defendant pleads the defense of entrapment, he has

the burden of showing that law enforcement officials induced him to commit a crime that he was not predisposed to commit and that the government implanted the criminal design in his mind. *United States v. Russell*, 411 U.S. 423, 433, 436, 93 S.Ct. 1637, 1643, 1645, 36 L.Ed.2d 366 (1973); *United States v. Anderton*, 629 F.2d 1044, 1047 (5th Cir. 1980); *United States v. Wolffs*, 594 F.2d 77, 79–80 (5th Cir. 1979). A claim of governmental overreaching, however, is a distinct and different defense in which the defendants contend that the government's involvement in the BRILAB scheme was so pervasive and outrageous that due process principles or the court's power of supervision over the criminal justice system require that the indictment be dismissed.

The Supreme Court on two occasions has declined to reverse a criminal conviction on grounds of governmental overreaching. There is language, however, in *United States v. Russell, supra,* and in the concurring and dissenting opinions in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), suggesting that the Court might be willing to accept the defense of governmental misconduct in an appropriate case. In *Russell*, the Court upheld the conviction for illegal manufacture of drugs even though an undercover agent had supplied him with an essential ingredient. The Court stated, however:

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, . . . the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the due process clause of the Fifth Amendment.

411 U.S. at 431–32, 93 S.Ct. at 1643. In *Hampton*, the Court upheld a conviction for heroin distribution, and Justice Rehnquist, writing for a three-justice plurality of the Court, completely rejected the governmental misconduct defense. 425 U.S. at 489–90, 96 S.Ct. at 1650. The concurring and dissenting opinions noted, however, that police overinvolvement in a crime could bar prosecution on due process grounds where the misconduct reached a "demonstrable level of outrageousness." *Id.* at 495 n.7, 96 S.Ct. at 1653 n.7.

■ Several courts of appeals have recognized that in some circumstances convictions obtained through egregious misconduct by government agents involved in the creation and maintenance of criminal activities would be vacated. *See United States v. Twigg*, 588 F.2d 373, 381 (3d Cir. 1978); *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973); *Greene v. United States*, 454 F.2d 783, 787 (9th Cir. 1971). The Fifth Circuit has agreed that in certain situations, a defense of governmental misconduct, separate and distinct from the defense of entrapment, may bar a criminal prosecution on due process grounds. In *United States v. Graves*, 556 F.2d 1319, 1324 (5th Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978), the court ruled that "[t]here is still available in appropriate cases a governmental misconduct defense grounded on the dual principles of due process and the supervisory powers of the court, but such a defense does not fall within the narrow confines of 'entrapment' as that term has been explicated in *Russell* and *Hampton*." Therefore, without deciding the merits of defendants' motion at this time, I conclude that the motion to dismiss the indictment on grounds of governmental overreaching presents a cognizable and legitimate defense.

Similarly, defendants' motion to dismiss on grounds of artificially created jurisdiction also presents a cognizable legal defense. The RICO statute itself makes clear that an effect on interstate commerce is an essential element of the federal offenses charged in the indictment. *See* 18 U.S.C. § 1962(a), (b), and (c). The motion to dismiss on grounds of artificially created jurisdiction is factually related to defendants' governmental overreaching argument in that they contend that government overin-

volvement in the scheme resulted in the creation and maintenance of the interstate commerce elements of the offense charged in the indictment.

In *United States v. Archer, supra*, federal and local law enforcement officers created an undercover operation to investigate suspected corruption and public bribery in the New York City criminal justice system. Two assistant district attorneys were eventually convicted of violations of the Federal Travel Act, 18 U.S.C. § 1952, but the Second Circuit reversed the convictions. In its original opinion, the court held that

> when Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings. . . . [M]anufactured jurisdiction "is a reflection of the federal judicial system which brings it into disrepute."

486 F.2d at 682 [citations omitted]. On rehearing, the Second Circuit tempered somewhat the breadth of its language, pointing out that its decision "in fact went no further than to hold that when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves and that this was not met here." *Id.* at 685–86.

The Fifth Circuit was faced with a similar motion to dismiss a Travel Act indictment on grounds of artificially manufactured jurisdiction in *United States v. Perrin*, 580 F.2d 730 (5th Cir. 1978), aff'd, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). In *Perrin*, the court rejected the defense under the particular facts of that case, but it recognized the validity of the defense in a

proper case when it stated that the "defendants' argument that the government improperly obtained jurisdiction is for the court to determine as a matter of law, . . ." *Id.* at 737. Therefore, again without passing on the merits of the motion, I conclude that the defendants' motion to dismiss on grounds of artificially created jurisdiction also presents a cognizable claim.

The two defense motions discussed above are not patently frivolous; their determination will require an evidentiary basis of some sort. Each motion looks to a determination of whether the government acted unlawfully, and each places in controversy the facts surrounding the government's conduct in this case. Without evidence, I cannot make the findings of fact, or draw the legal conclusions necessary to decide defendants' motions. Therefore, having determined that these motions raise legitimate defenses in law to criminal prosecutions, I also conclude that an evidentiary hearing must be conducted. The remaining question is when such a hearing should be conducted.

Fed.R.Crim.Pro. 12(b) provides that "[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion." The rule then enumerates five kinds of motions which *must* be raised prior to trial. Included are defenses and objections "based on defects in the institution of the prosecution" and "defenses and objections based on defects in the indictment or information." In *United States v. Covington*, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969), the Supreme Court interpreted substantially similar language in the forerunner of the present Rule 12(b). In *Covington*, the Court stated that a defense is capable of determination without trial of the general issue "if trial of the facts surrounding commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* at 60, 89 S.Ct. at 1561. The Court noted that the rule permits factual hearings prior to trial "if necessary to resolve issues of fact peculiar to the motion." *Id.*

Under Fed.R.Crim.Pro. 12(e), however, I have the discretion to defer for good cause the determination of such motions until the trial or after the verdict. The rule provides:

A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

The legislative history of Rule 12(e) indicates that the Supreme Court initially proposed that the rule allow a court "to defer ruling on a pretrial motion until the trial of the general issue or until after the verdict" without mention of "good cause." H.R. Rep.No.94–247, 94th Cong., 1st Sess., *reprinted in* [1975] U.S.Code Cong. & Ad. News 674, 679–680. In reviewing the Supreme Court's proposals, however, the Committee on the Judiciary of the House of Representatives modified the Supreme Court's proposal to permit a court to defer its ruling on pretrial motions only for good cause. The Committee's chief concern was that a court not be allowed to defer its ruling if to do so would adversely affect a party's right to appeal, especially the government's right to appeal pursuant to 18 U.S.C. § 3731. The House Judiciary Committee intended its amendment to "discourage the tendency to reserve rulings on pretrial motions until after verdict in the hope that the jury's verdict will make a ruling unnecessary." H.R.Rep.No.94–247, 94th Cong., 1st Sess., *reprinted in* [1975] U.S. Code Cong. & Ad.News 674, 680.

The question here is whether there is "good cause" within the meaning of Rule 12(e) to defer conducting an evidentiary hearing and ruling on defendants' motions until trial of the case or after the verdict is rendered.

Although there is very little case law addressing the issue of whether evidentiary hearings on motions like these must be conducted prior to trial and whether the motions must be decided pretrial, I find some guidance for my decision in two recent cases. In *United States v. Criden et al.,* Crim. No. 80–166 (E.D.Pa., Aug. 18, 1980) (Fullam, J.), the court was faced with a similar motion to dismiss the indictment on grounds of governmental misconduct in one of the Justice Department's ABSCAM prosecutions.[2] Judge Fullam conducted several days of evidentiary hearings on various motions brought by the defendants; nevertheless, he concluded that resolution of the governmental misconduct issue had to be deferred until trial when a full and complete record would be available. In *United States v. Barletta,* 500 F.Supp. 739 (D. Mass., 1980) (Tauro, J.), the government brought a motion prior to retrial of a multicount indictment to admit evidence consisting of tape recordings of telephone conversations between the defendant and a government informer. The court decided to defer conducting an evidentiary hearing or ruling on the motion until trial. While the motion at issue in *Barletta* differs from those before me, I find that the interests supporting deferral in *Barletta* are applicable here. In *Barletta,* Judge Tauro said:

It makes sense that pretrial proceedings be designed to avoid, whenever possible, the time-consuming chore of hearing the same evidence twice, first before and then during trial....

\* \* \* \* \* \*

Rule 12 was designed to avoid the wasteful duplication of effort inherent in the government's theory that would mandate pretrial determinations of motions to admit without regard to any good cause there may be to defer.... Our courts are overburdened. Judges, therefore, have an obligation to expend judicial re-

---

**2.** ABSCAM is a code name for an undercover operation carried out by the Justice Department at about the same time as the BRILAB investigation. In ABSCAM, FBI agents set up an operation called Abdul Enterprises, Inc., and posed as representatives of Middle Eastern businessmen who sought assistance from public officials for business enterprises.

sources prudently. This includes ensuring that valuable court time is not wasted. A determination to defer in order to avoid such waste is manifestly one made for good cause....

\* \* \* \* \* \*

A precedent mandating that a district judge hear the same evidence twice would be an imprudent imposition on the limited resources of the judicial system.

*Id.*, at 742, 744, 747.

In this case, defendants seek an "unfettered" inquiry into the conduct of government officials. *See* defendants' joint supplemental memo of Oct. 9, 1980. The allegations of government misconduct before me at this time are vague, and to permit an unstructured inquiry without limitation at this stage of the proceeding would require hearings which could last as long as the trial itself, with the defendants hoping to uncover some wrongdoing by government agents or officials. The facts that describe the government's undercover operation, the offenses attributed to the defendants in the indictment, and the alleged acts of misconduct imputed to government officials by the defendants are intertwined. In my judgment, they cannot be successfully disentangled. Most of the facts that the defendants want to prove at a hearing will be elicited during the complex and lengthy trial anticipated by both sides. This point is best illustrated by the close relationship between the defendants' claims of governmental overreaching and the classic defense of entrapment. *See generally United States v. Graves, supra,* 556 F.2d at 1321–24. Although the court in *Graves* pointed out that the defense of governmental misconduct "grounded on the dual principles of due process and the supervisory powers of the court" is separate and distinct from the defense of entrapment, *id.* at 1324, the facts supporting the overreaching defense appear to be included within the entrapment defense. Although in *Graves* the Fifth Circuit left no doubt that it was not error to consider the governmental misconduct defense pretrial, *id.* at 1322–23, the court did not require that the motion be disposed of

pretrial or that evidentiary hearings concerning the motion be conducted pretrial.

I am sensitive to the concerns expressed by counsel for defendant Marcello at oral argument that insofar as defendants' motions would dispose of the case and spare defendants the long ordeal and expense of trial if they are granted, the evidentiary hearing should be conducted and a ruling made on the motions now. These are important concerns which I do not brush aside lightly. I find, however, that in the context of this factually complex case, the best course to protect both the defendants' constitutional rights and society's interest in the just and efficient administration of criminal justice is to defer resolution of the motions until trial of the case. At the time of the trial, I can assess the full panoply of facts, including the conduct of the FBI undercover agents and government attorneys who conducted the investigation and the nature of the interstate commerce elements of the offenses charged in the indictment. The trial will also provide an opportunity for counsel to define more precisely the areas of inquiry that support their contentions, which at this time are rather vague. Moreover, resolution of the issues presented by defendants' motions may require that defendants themselves testify regarding the impact of the alleged overreaching or the existence of relationships required in the interstate commerce element of the offense. If I find that further hearings appear necessary or appropriate as a result of the trial, they will be ordered immediately. The interests of the defendants and of society are best served if these serious motions are determined on the basis of a full evidentiary record and a complete understanding of the facts of this complex case. Therefore, I conclude that the evidentiary hearing and resolution of these motions must be deferred until trial.

In addition, counsel for defendant Marinello contended during oral argument of his separate motion to dismiss that the RICO offenses charged in Counts I and II of the indictment failed to state an effect on interstate commerce as required by the RICO

statute because Fidelity Financial Consultants, the California firm set up by the Justice Department as part of the investigation, was a purely fictitious operation through which insurance contracts could never have been written. I requested that counsel for the government and defendant Marinello submit supplemental memoranda on the issue. As counsel for Marinello notes in footnote 1 of his supplemental memorandum, this argument is in fact closely related to defendants' joint motion to dismiss on grounds of artificially-created jurisdiction. Since I have deferred until trial my ruling on the motion to dismiss on grounds of artificially-created jurisdiction, I will also reserve judgment on this argument until that time. In all other respects, the motion to dismiss brought individually by defendant Marinello is denied.

### B) *Selective Prosecution*

Defendant Marcello's motion to dismiss the indictment on grounds of discriminatory and arbitrary selective prosecution stands in a slightly different procedural posture from the two motions discussed above. Like those motions, the motion to dismiss for selective prosecution raises a cognizable defense to a criminal prosecution. The Fifth Circuit has ruled, however, that a defendant bears a heavy burden of establishing, at least *prima facie*, that (1) he has been singled out for prosecution while others similarly situated have not generally been proceeded against for similar conduct, and (2) the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i. e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. *See United States v. Johnson*, 577 F.2d 1304, 1308 (5th Cir. 1978); *United States v. Kahl*, 583 F.2d 1351, 1353 (5th Cir. 1978). There has been some disagreement among the circuits, however, over the second prong of the test stated above. Some decisions have indicated that relief may be available when intentional or purposeful discrimination is practiced against an individual, even though the discrimination is not class-based. *See United States*

*v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979), *cert. denied*, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1980); *United States v. Falk*, 479 F.2d 616, 619 (7th Cir. 1973).

■ Criminal prosecutions are generally presumed to have been undertaken in good faith and nondiscriminatorily, *United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978); *United States v. Falk, supra*, 479 F.2d at 620, and the burden of proving discriminatory selective prosecution is on the defendant. Several courts have held that in order to minimize intruding on the largely discretionary prosecutorial function while still enabling defendants effectively to raise claims of selective prosecution, the defendant is obligated to make a threshold showing of discriminatory prosecution before an evidentiary hearing will be conducted on this defense. *In re Grand Jury*, 619 F.2d 1022, 1030 (3d Cir. 1980); *United States v. Torquato, supra*, 602 F.2d at 569–70, *and cases cited therein*. Before a hearing will be conducted, some credible evidence must be adduced showing that the government intentionally and purposefully discriminated against the defendant. *Id.* at 570. In *Torquato*, for example, the Third Circuit denied defendant's request for a post-trial evidentiary hearing on the question of selective prosecution, finding that even after a full trial on the merits, defendant had failed to show a sufficient factual basis to require that an evidentiary hearing be held. *Id.* at 572.

In this case, defendant Marcello has not preliminarily adduced any credible evidence of his discriminatory selective prosecution by the government. Defendant's motion papers contain speculation that the prosecution is in some way tied to government "frustration" over its inability to prevail in a deportation proceeding presently pending against Marcello. The motion also asserts without any apparent evidentiary backing that the government has arbitrarily and falsely labeled Marcello as an Organized Crime chieftain. Defendant comes closest to adducing some credible evidence of selective prosecution when he argues that some of the consensually obtained tape record-

ings made by the government with the assistance of its chief informer, Joseph Hauser, show that Marcello was unlawfully selected and pursued by the government as the target of its investigation. Defendant has pointed to no specific conversations on these tapes, however, that would tend to provide the *prima facie* showing he must make to be entitled to a full evidentiary hearing on this issue.

Shortly after I made my oral ruling deferring an evidentiary hearing and resolution of defendants' overreaching and artificially created jurisdiction motions until trial, counsel for defendant Marcello requested that I also defer ruling on his motion to dismiss on grounds of selective prosecution, and I have agreed to defer it. It may be that some evidence will be adduced at the trial that will be useful in deciding this motion or that will require that I conduct further evidentiary hearings after the trial.

### C) *Prejudicial Publicity*

Defendants' motion to dismiss the indictment, or alternatively for sanctions, on grounds that they were prejudiced by government-initiated leaks to the news media also requires that I determine whether extensive pretrial evidentiary hearings must be conducted. Defendants first contend that pre-indictment publicity engendered by leaks to the press by government sources so tainted the grand jury process that their Fifth Amendment rights to fundamental fairness and due process of law have been irreparably impaired. The alternative of defendants' motion seeks sanctions because government officials who leaked information to the news media vio-

lated Fed.R.Crim.Pro. 6(e), internal guidelines of the United States Justice Department, and Rules 13.1 and 13.2,[3] Local Rules of the United States District Court for the Eastern District of Louisiana. Defendants' request for an evidentiary hearing on this part of their motion is clearly governed by the Fifth Circuit's decision in *In re Grand Jury Investigation, T. Bertram Lance v. United States Department of Justice* (the *Lance* case), 610 F.2d 202 (5th Cir. 1980). In a thorough and well-reasoned opinion, *Lance* provides guidelines to the general question of when to hold an evidentiary hearing on alleged violations of the traditional policy of grand jury secrecy. After reviewing the existing evidentiary record and analyzing the factors outlined in the *Lance* case, I conclude that no further evidentiary hearing is required and that insofar as defendants' motion seeks dismissal of the indictment, the motion is denied.

I note initially that the evidentiary record that already exists provides evidence determinative of this motion. The defendants initially submitted as exhibits attached to their motions fifteen newspaper articles and one transcript of a television newscast, all of which were released between February and June 1980 when the media frequently reported on the pending BRILAB investigation. The defendants later supplemented these with several other newspaper articles from publications across the country. In addition, I have received and reviewed affidavits submitted by seven government attorneys denying that they disclosed matters concerning the investigation to any unauthorized persons and also denying any knowledge that any other participants in the investigation disclosed se-

---

**3.** Local Rule 13.1 provides:

It is the duty of the lawyer for each of the parties not to release or authorize the release of information or opinion in connection with pending or imminent criminal litigation with which he is associated, for dissemination by any means of public communication, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Local Rule 13.2 provides:

When there is a grand jury or other pending investigation of any criminal matter, a lawyer participating in the investigation shall refrain from making any extrajudicial statement for dissemination by any means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is under way, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, or to warn the public of any dangers, or otherwise to aid the investigation.

cret matters. At my request, I was also provided with a copy of the so-called Blumenthal Report, an extensive document prepared by the Justice Department which reviews in detail its confidential and internal investigation aimed at discovering the sources of leaks to the news media that occurred during the government's principle "sting" operations, including BRILAB. Finally, at defendants' request, I have reviewed transcripts of the proceedings of the grand jury that returned the indictment in this case. In addition to this evidence, defendants had subpoenaed at the time of the hearings on this motion several members of the press whose news stories appeared during the investigation and a number of Justice Department attorneys and officials, presumably to elicit their testimony about the source of news leaks. Based on the arguments of counsel and the evidence already at my disposal, I decided those subpoenaed need not testify at this time.

■ While *Lance* involved facts different in several respects from those here, its teachings are applicable. *Lance* requires that in determining whether the moving party has established a *prima facie* case of prejudicial and unlawful leaks of secret grand jury information sufficient to require a broad evidentiary hearing, a court must consider five factors. First, there must be a clear indication that the media reports disclose information about matters occurring before the grand jury. 610 F.2d at 216. In this case some of the articles about which defendants complain rely for their sources on defendants themselves, *see, e. g.,* defendants' exhibit F or on court documents and records. *See, e. g.,* defendants' exhibit A, paragraph 1; defendants' exhibit N. Some do appear, however, to disclose information about matters occurring before the grand jury. *See, e. g.,* defendants' exhibits L, M, O, P.

Second, the articles must "indicate the source of the information revealed to be one of those proscribed by Rule 6(e)." *Id.* at 217. Those sources include grand jurors, court reporters, typists, government attorneys, and other government officials to whom disclosure may be made under the rule. Scattered throughout the articles submitted by the defendants are references to "sources close to the investigation," "Federal sources," "Justice Department sources" and simply "sources." No reference is made in any of the articles to a particular person or persons, and in some of the articles, high-ranking officials in the Office of the United States Attorney and the FBI are reported to have specifically refused to comment or give out details on the investigation. *See, e. g.,* defendants' exhibit D. However, in determining whether these vague origins actually implicate sources prohibited by Rule 6(e), it is necessary to consider the nature of the material disclosed. *Id.* at 217–18. In some instances, it is reasonable to infer from the nature of the disclosure made that the "sources" referred to in the article are included within those enumerated in Rule 6(e).

Third, "in assessing the what and who of disclosure at the *prima facie* case stage, the court must assume that all statements in the news report are correct." *Id.* at 219. I have done so in this case.

Fourth, the nature of the relief requested and the extent to which it interferes with the grand jury process must be considered. A defendant seeking dismissal of an indictment "bears a heavy burden in attempting to justify such relief." *Id.* On the other hand, a *prima facie* case requiring a hearing on whether to impose sanctions does not require as strong a showing. In this case, defendants seek both forms of relief—dismissal and contempt sanctions.

Fifth, the court must weigh any evidence presented by the government to rebut the assumed truthfulness of reports which otherwise make a *prima facie* case of misconduct. *Id.* at 219. In *Lance,* government attorneys provided no evidence denying misconduct and the court found that the articles presented by Lance in support of his motion made a sufficient *prima facie* case to warrant an evidentiary hearing "*in the absence of any affidavit* by the Justice Department attorneys denying that they,

their associates, or their superiors divulged the information appearing in the newspaper articles." *Id.* at 220–21 (emphasis added). The absence of affidavits appeared to be a key factor in the court's decision to remand the *Lance* case to the district court for a factual analysis of "whether the showing made by Lance would still warrant an evidentiary hearing even if a responsive affidavit should be filed by government counsel." *Id.* at 221. I note in this case that while I have received affidavits from seven government attorneys who conducted the grand jury investigation locally, I have received nothing from the FBI agents or other government officials who may have been privy to the grand jury proceedings.

■ Insofar as defendants' motion seeks dismissal of the indictment, the fourth and fifth factors of the *Lance* test weigh heavily against conducting any further evidentiary hearing. As *Lance* points out, a "criminal defendant who seeks to obtain dismissal of an indictment ... bears a heavy burden in attempting to justify such relief." *Id.* at 219. This heavy burden requires a showing of prejudice to the defendants or abuse of the grand jury process by the government. *See United States v. Thomas*, 593 F.2d 615, 623 (5th Cir. 1979); *United States v. Malatesta*, 583 F.2d 748, 753–54 (5th Cir. 1978), *cert. denied*, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979). Defendants have failed to bear that heavy burden in this case. I have examined carefully the transcripts of the grand jury proceedings, and I have found nothing to indicate that the grand jury process which led to these indictments was in any way affected by publicity or by any misconduct by government attorneys. Instead, the indictment appears to have been the result solely of the evidence that was presented to the grand jury. My review of these transcripts and the existing evidentiary record convinces me that an evidentiary hearing on the motion to dismiss is unnecessary and that no abuse of the grand jury process resulting in prejudice to the defendants occurred. Therefore, the motion to dismiss the indictment on these grounds is denied.

Defendants' motion for sanctions, however, presents a slightly different situation. The *Lance* case notes that a defendant's burden in showing a *prima facie* case sufficient to require an evidentiary hearing on a motion for sanctions does not require as strong a showing as the motion to dismiss. The defendants have submitted newspaper articles and a broadcast transcript, portions of which appear to satisfy the first three elements of the *Lance* standard for conducting an evidentiary hearing. On the other hand, the government has submitted affidavits rebutting the assumed truthfulness of the news reports. Moreover, I have reviewed the Blumenthal Report, and found it inconclusive at best since it buttresses the government's affidavits in some respects and the defendants' claims in others. In *Lance* the Fifth Circuit remanded the case to the district court for factual analysis of whether the preliminary showing would warrant an evidentiary hearing if the government filed responsive affidavits. In this case, the government has filed affidavits which are only partially responsive. Rule 6(e) imposes an obligation of secrecy not only on government attorneys, but also on FBI officials and others who participate in the grand jury proceedings. I have deferred my ruling on defendants' motion for sanctions. The government may supplement its proffer, if it can, by filing, no later than February 2, 1981, affidavits of FBI agents or other officials who participated in the grand jury proceeding. At that time I will again review the materials submitted by defendants, the affidavits, and the Blumenthal Report to determine what further action, if any, by way of evidentiary hearing or court-ordered investigation is appropriate.

IV. *Motions to Suppress the Consensually Recorded Tapes*

Central to the government's case are the electronically recorded conversations between informer Joseph Hauser and some of the defendants. The defendants argue that the tapes were unlawfully obtained because Hauser's consent was not given freely and voluntarily, knowingly and understanding-

ly, and they are therefore inadmissible. In an effort to compel an evidentiary hearing on the issue of Hauser's consent, the defendants submitted with their motions evidence which they contended constituted a sufficient preliminary showing of Hauser's incapacity to consent. Included in their proffer was a transcript of Hauser's February 5, 1979 guilty plea before the Honorable William C. Frey, United States District Judge for the District of Arizona, *United States v. Hauser*, No. CR–78–313 (D.Ariz., Feb. 5, 1979), to RICO charges arising from a scheme to swindle health, welfare and pension funds from labor unions. Defendants contend the facts surrounding the guilty plea are relevant because it was entered contemporaneously with Hauser's decision to cooperate with the government by taping his conversations. They argued that Hauser made several statements that indicate he could not have knowingly and voluntarily consented to the recordings.[4]

In support of their claim of incompetence, the defendants also submitted the affidavit of Dr. Kenneth Ritter, a psychiatrist who reviewed a portion of Hauser's guilty plea and concluded that some of the drugs Hauser was taking "have the capacity to alter levels of consciousness, awareness, alertness, and mood" and are normally prescribed to treat serious mental or brain disorders that "may profoundly affect a person's capacity to freely give unbiased consent." In addition, defendants pointed out portions of the early consensual tapes in which Hauser said he was under mental and financial pressure. In anticipation of a hearing on the issue of Hauser's ability to consent, defendants subpoenaed Hauser's medical records from his personal physician in California.

On the basis of this preliminary showing and to allow the parties a meaningful opportunity to meet their burdens on this issue, I conducted an evidentiary hearing limited to the question of Hauser's consent. *See generally United States v. Glickman*, 604 F.2d 625, 629, 633 (9th Cir. 1979), *cert. denied*, 444 U.S. 1080, 100 S.Ct. 1032, 62 L.Ed.2d 764 (1980); *United States v. Phillips*, 540 F.2d 319, 324 (8th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976); *United States v. Napier*, 451 F.2d 552 (5th Cir. 1971). At the hearing, the government introduced into evidence seven consent forms executed by Hauser in the presence of FBI agents in which he agreed to allow his conversations to be recorded. The government also called as witnesses FBI Agents William Wiechert and Thomas Rupprath, who witnessed the signing of the forms. They testified that Hauser's demeanor at the time he executed the forms was "rational and normal" and that Hauser appeared lucid and in control of his faculties. They also testified that Hauser was not threatened, physically abused, or in any way coerced before signing the forms. Agent Wiechert said that while he occasionally saw Hauser taking pills, he appeared to be lucid and not suffering from any debilitating effects from the pills.

Over the government's objection, I permitted the defendants to examine Hauser's medical records, and they were reviewed by Dr. Ritter. On the following day, Dr. Ritter testified that the drug dosages Hauser was taking at or about the time of his agreement to consent to the tapings was a "formidable dose of medication" which itself could have affected Hauser's ability to consent, although it was possible for some persons to function quite well under the

---

4. For example, the defendants point out that Hauser told Judge Frey that as an adolescent in Poland during World War II he was struck on the head with a bar when he tried to escape from an internment camp (defendant Marinello, exhibit 2, plea transcript p. 5). Hauser also said that he had been "under a tremendous pressure" for the last five years and that at the time he changed his plea he was taking twenty pills a day, including Dilantin, Valium, Mellaril and Benzedrine (transcript p. 8). Hauser also

said that his doctor told him that at times his medication took away his ability to reason and understand, and that at his physician's suggestion he had seen a psychiatrist for treatment of depression. (Transcript pp. 10–13). It should be noted, however, that despite these problems Hauser assured Judge Frey that he fully understood the proceeding and the charges to which he pleaded guilty, and Judge Frey accepted the plea.

same dosages. He concluded based on the limited information available to him that it was possible that Hauser might have been incapable of consenting. After being given the opportunity to review the full transcript of Hauser's guilty plea, the doctor testified that it appeared that Hauser understood the exhaustive questioning and the nature and meaning of his plea of guilty at that time.

Finally, I allowed counsel to question Hauser himself as part of the evidentiary hearing. Hauser identified the consent forms and testified that the FBI agents explained them to him, that the agents made no threats or promises to him, and that he understood the nature and content of the forms when he signed them. Hauser testified that although he was taking medication at the time he consented to the recording of his conversations, his senses were not impaired. At the conclusion of Hauser's testimony, the defendants requested that I compel a psychiatric examination of Hauser which I declined on the basis of the evidentiary record. After considering the testimony of the witnesses, the transcript of Hauser's Arizona guilty plea, the documentary evidence submitted by the parties, and having listened to the consensual tape recordings prior to the hearings, I determined that Hauser's consent to the recording of his conversation was given freely and voluntarily, knowingly and understandingly as required by law.

■ Knowing and voluntary consent is a requisite to lawful interception of consensually recorded conversations. *See* 18 U.S.C. § 2511(2)(c) and (d); *United States v. Juarez*, 573 F.2d 267, 278 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978). Some circuits have stated that consent will ordinarily be established if the government shows merely that the informant engaged in the conversation knowing that it was being taped. *United States v. Glickman, supra*, 604 F.2d at 633; *United States v. Fuentes*, 563 F.2d 527, 533 (2d

Cir.), *cert. denied sub nom., Sansone v. United States*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *United States v. Kirk*, 534 F.2d 1262, 1272–73 (8th Cir. 1976), *cert. denied*, 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977); *United States v. Bonnano*, 487 F.2d 654, 658–59 (2d Cir. 1973). In *Glickman*, the Ninth Circuit summarized this general approach by saying:

> The extent of proof required to show that an informer consented to the monitoring or recording of a conversation is considerably less stringent than that needed to show consent to a physical search. The reasons for this less stringent standard regarding conversations is that . . . . [a]n informer's consent to the monitoring or recording of a telephone conversation is an incident to a course of cooperation with law enforcement officials on which he has ordinarily decided some time previously and entails no unpleasant consequences to him.
>
> In order to establish consent to taping of conversations, it will ordinarily suffice for the government to show that the informant engaged in the conversation knowing that it was being taped.

604 F.2d at 633–34 (citations omitted). A panel of the Fifth Circuit, however, has indicated that the validity of an informer's consent to the recording of his conversations must be measured against the more stringent standard of consent to a physical search. In *United States v. Napier*, 451 F.2d 552, 553–54 (5th Cir. 1971), the court cited its decision in *United States v. Elrod*, 441 F.2d 353 (5th Cir. 1971), a case involving the validity of a defendant's consent to a search of his hotel room, as providing the proper standard for determining the effect of mental capacity on the ability to consent to the recording of conversations.[5] In *Elrod*, the court said that "a determination of the question of free and voluntary consent requires a determination that the person was mentally competent to understand the nature of his act *when he signed* the 'Con-

---

5. In a footnote in *Glickman*, the Ninth Circuit recognized the different standard applied by the Fifth Circuit in *Napier* and *Elrod*, but ruled that *Napier* and *Elrod* were inapposite to the facts of *Glickman*. *See United States v. Glickman, supra*, 604 F.2d at 634 n.5.

sent to Search' form." 441 F.2d at 355 (emphasis by the court). The court said that the act of consent must be "the consensual act of one who knew what he was doing and had a reasonable appreciation of the nature and significance of his actions." *Id.*

 Regardless which standard is applied In this case, however, I conclude that Hauser was mentally capable of freely and voluntarily consenting to the recording of his conversations, and that he did so. The consent forms, the agents' testimony, Hauser's testimony during the evidentiary hearing, and the transcript of his guilty plea, which was accepted by Judge Frey, convince me that Hauser's consent was knowingly and understandingly given. Moreover, one need not listen too long to the tape recordings themselves to become satisfied beyond peradventure of doubt that they were made freely and with full understanding of what was going on. I therefore conclude that the defendants' motions to suppress the consensually recorded conversations must be denied.

 In addition to the grounds discussed above, defendant Davidson argues that because (1) Hauser was not acting "under color of law" as required by 18 U.S.C. § 2511(2)(c), and (2) the taping was for purposes of committing criminal, tortious, or injurious acts by Hauser, a person not acting under color of law, and the tapes were therefore unlawfully made under 18 U.S.C. § 2511(2)(d) and must be suppressed. I find that these arguments are without merit. Section 2511(2)(c) provides that it "shall not be unlawful . . . for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

The courts have generally held that where an informer is acting under the direction and supervision of government investigators, as the evidence indicates Hauser was doing in this case, the informer is acting under color of law within the meaning of the statute. *See United States v. Rich*, 518 F.2d 980, 985 (8th Cir. 1975), *cert. denied*, 427 U.S. 907, 96 S.Ct. 3193, 49 L.Ed.2d 1200 (1976); *United States v. Ransom*, 515 F.2d 885, 890 (5th Cir. 1975), *cert. denied*, 425 U.S. 945, 96 S.Ct. 1687, 48 L.Ed.2d 189 (1976). Since I conclude that Hauser was acting under color of law in this way, it is unnecessary to reach defendant's second argument, which is prefaced on the assumption that Hauser was not acting under color of law, and defendant Davidson's motion to suppress on these grounds is denied.

## V. Motions to Suppress the Court-Ordered Wiretaps

 In their motions to suppress the court-ordered wiretaps, the defendants contend that their tape-recorded conversations made pursuant to wiretap orders issued by United States District Judges under 18 U.S.C. § 2510 *et seq.* are inadmissible for a variety of reasons. Their chief arguments are that (1) the orders authorizing the wiretaps were not founded on a showing of probable cause; (2) FBI agents and government attorneys misrepresented and omitted material facts in the affidavits accompanying the applications for authorization to tap defendants' telephones; and (3) the government did not comply with the requisite statutory provisions permitting wire intercepts. The defendants contend that each subsequent application for a wiretap order in the long series of intercepts authorized in this investigation builds upon the fruits of the previous orders. Thus, defendants have concentrated their challenges [6] on the earli-

---

**6.** It is undisputed in this case that defendants Davidson and Marcello have standing to challenge any and all of the wiretap orders, and they have brought their own motions or adopted the arguments of their co-defendants in seeking suppression of these tapes. The government has challenged the standing of defendants Marinello, Roemer, and Young to at-

tack the early wiretap orders on grounds that as to these orders they are not "aggrieved persons" within the meaning of 18 U.S.C. § 2518(10)(a) and *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). I agree, however, with defendants' contention that each subsequent wiretap order issued in the long series of orders in this case

est applications and orders of May 4, June 13, and June 14, 1979.

The affidavits upon which defendants focus their attack are virtually identical; each can be divided into two sections. In the May 4, 1979 affidavit of FBI Agent Charles Walker, for example, the first 14 paragraphs consist of background information purportedly provided in an April 4, 1979 conversation between Walker and Hauser in which Hauser described past dealings he allegedly had with defendants Marcello and Davidson. The second part of the affidavit contains information purportedly gleaned from recorded telephone and personal communications of Davidson, Marcello and Hauser made by the FBI with Hauser's consent. Walker stated in the affidavit that he had personally reviewed each of the conversations and summarized their content. Walker's May 4 affidavit was included in the application for the initial wiretap order prepared by government attorney Bruce Kelton and submitted to United States District Judge Charles R. Richey in Washington, D.C. It appears in substantially similar form along with another affidavit in which FBI Agent Doug Bird purportedly summarizes additional telephone conversations intercepted pursuant to the May 4 order in the June 13 application, and again above Walker's signature in the June 14 application. Both Walker and Kelton testified extensively during the evidentiary hearings.

A) *Sufficiency of the Affidavits: Probable Cause, Misrepresentations, and Omissions*

Defendants' arguments that the recordings are inadmissible because the orders were not supported by probable cause and because there were material misrepresentations and omissions in the affidavits supporting each wiretap application are somewhat related. Both involve the ultimate question of the sufficiency and validity of the affidavits supporting the determination of probable cause to wiretap. The arguments require that I inquire into (1) the "facial" sufficiency of the affidavits and whether the hearsay and double hearsay statements in the background paragraphs provided by Hauser are sufficient to support a finding of probable cause, and (2) the "subfacial" sufficiency of the affidavits and whether there were material misrepresentations and omissions that affected the magistrate's determination of probable cause.

■■■ An order authorizing a wiretap, like an ordinary search warrant, must be supported by a magistrate's finding of probable cause. 18 U.S.C. § 2518(3)(a); *United States v. Weinrich*, 586 F.2d 481, 487 (5th Cir. 1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979); *United States v. Hyde*, 574 F.2d 856, 862 (5th Cir. 1978). In general, probable cause exists where "the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed." *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). The Supreme Court has recognized that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause," and that magistrates may use their common sense in determining the existence of probable cause. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590–91, 21 L.Ed.2d 637 (1969). *See also United States v. Davis*, 617 F.2d 677, 659 (5th Cir. 1979). A magistrate's determination of probable cause should be paid great deference by reviewing courts, as long as the magistrate has performed his independent function and not served merely as a rubber stamp for the police. *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512,

built upon previously issued orders to establish probable cause. It is clear that all defendants eventually became "aggrieved persons" at one point or another in the series of wiretap orders. Since the early wiretap orders formed the linchpin upon which all later findings of proba-ble cause and the wiretap orders were based, I conclude that all defendants have standing to raise these challenges to the wiretap orders. Therefore, I have allowed counsel for all defendants to present their arguments on these motions.

12 L.Ed.2d 723 (1964); *See Spinelli v. United States, supra*, 393 U.S. at 419, 89 S.Ct. at 591; *United States v. Davis, supra*, 617 F.2d at 692. When the magistrate's finding of probable cause is based on his review of the entire picture presented to him and the use of his own judgment and common sense, his determination is conclusive in the absence of arbitrariness. *United States v. Weinrich, supra*, 586 F.2d at 487; *United States v. Hyde, supra*, 574 F.2d at 862.

■ The defendants' arguments in these motions to suppress raise what the Fifth Circuit has described as challenges to both the "facial sufficiency" of the affidavits and the "subfacial sufficiency" of the affidavits. *See United States v. Martin*, 615 F.2d 318 (5th Cir. 1980). An attack on the facial sufficiency of the affidavit involves the information contained within the four corners of the affidavit itself. A challenge to the subfacial validity of the affidavit goes beyond the document and concerns itself with alleged misrepresentations and omissions that could have affected the magistrate's assessment of probable cause.

■ In this case, defendants challenge the facial sufficiency of the affidavits by arguing that the hearsay and double hearsay information provided to the affiant by Hauser and the information gleaned from the consensually recorded taped communications were insufficient to support a finding of probable cause. Where the information contained in an affidavit supporting a wiretap order is obtained from an informer such as Hauser, the magistrate's determination of probable cause must be measured against the dual test established by *Aguilar v. Texas, supra*, and *Spinelli v. United States, supra*. First, the affidavit must provide the magistrate with the underlying facts from which the informant concluded that criminal activity was occurring or had taken place, and these facts must warrant an inference of criminal activity. Second, the affidavit must provide facts establishing the probable credibility of the informer or the reliability of his information. Both requirements must be satisfied; if either is not met, the affidavit cannot establish prob-

able cause. *United States v. Martin, supra*, 615 F.2d at 324. I conclude in this case that both elements of the *Aguilar-Spinelli* test are satisfied on the face of the affidavits.

■ The background portion of the affidavit sets out sufficient facts as related by the informer, Hauser, taken as a whole and read in context with the entire affidavit to warrant an inference that criminal activity related to the acquisition of insurance contracts through corrupt influence and bribery had occurred in 1976. Similarly, the affidavit contains sufficient facts provided by the consensually-made tape recordings to warrant an inference that influence and payoffs were to be used to obtain public employee insurance contracts in Orleans and Jefferson Parishes in 1979. I conclude from my reading of the affidavits that sufficient facts were stated to satisfy the first element of the *Aguilar-Spinelli* test. Similarly, the detailed affidavits submitted in support of the early wiretap applications also supplied the judges who issued the orders with sufficient facts to determine the probable credibility and reliability of the informer. The information contained in the background portion of the affidavit related to the 1976 transactions is detailed and is based largely on Hauser's personal knowledge, observations, and participation in the activity. Much of the background information concerning Hauser's past dealings with Marcello and Davidson is corroborated by the consensual recordings which are the source of the information contained in the second part of the affidavits. The affidavit informs the magistrate that despite Hauser's past dealings with Marcello and Davidson, he was now cooperating with the FBI by taping conversations in connection with the investigation, (May 4, 1979 affidavit of Walker, ¶ 15), and that a federal criminal prosecution was pending against Hauser at the time he was becoming involved as an informer in the BRILAB investigation (May 4, 1979 affidavit of Walker, ¶ 52). In short, the information set out in the affidavits provided the magistrates with sufficient evidence to warrant a finding of probable cause, and those findings should not now be disturbed.

Defendants' challenge to the subfacial sufficiency of the affidavits argues that the affidavits are flawed by material misrepresentations and omissions that undermine the affidavits and vitiate the finding of probable cause. These arguments go beyond the four corners of the affidavits to attack the probable cause determinations. The validity of such subfacial challenges to affidavits presented in support of warrants was recognized by the Supreme Court in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and has also been recognized by the Fifth Circuit. *United States v. Martin, supra*, 615 F.2d at 328; *United States v. Astroff*, 578 F.2d 133 (5th Cir. 1978). In *Franks*, the Court recognized a defendant's right to challenge the truthfulness of statements made by the affiant in an affidavit supporting a warrant and ruled that in some circumstances a pretrial evidentiary hearing on the issue might be required. If at the hearing "the allegation of perjury or reckless disregard [for the truth] is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." 438 U.S. at 156, 98 S.Ct. at 2676. In a summary at the end of its opinion, the Court said:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of *deliberate falsehood or of reckless disregard for the truth*, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or otherwise reliable statements of witnesses should be furnished, or their ab-

sence satisfactorily explained. *Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant.* Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. 171–72, 98 S.Ct. 2684–85 (emphasis added). While *Franks* deals only with misrepresentations in the affidavit, the Fifth Circuit has held by analogy to *Franks* that "omissions ... made intentionally or with reckless disregard for the accuracy of the affidavit" may also vitiate a finding of probable cause. *United States v. Martin, supra*, 615 F.2d at 329.

Using *Franks* as my guide, I determined that defendants had made a sufficient preliminary showing of possible misrepresentations and omissions in the affidavit to warrant an evidentiary hearing. At that hearing, the testimony of FBI Agent Charles Walker, the affiant in the May 4, 1979 application for a wiretap order, and Bruce Kelton, the government attorney who prepared the initial application, was taken. In addition, defendants submitted a substantial amount of documentary evidence. Also admitted into evidence during this hearing were copies of the consensually recorded taped communications of Hauser, Marcello, and Davidson made prior to the May 4 application and accompanying transcripts of the tapes prepared by the government. I have now carefully reviewed the evidence and listened to the tape recordings, and I conclude that defendants' motions to suppress on these grounds must be denied. It is true, as defendants have pointed out, that there were some misrepre-

sentations and omissions in the affidavits, but in each instance they were either unintentional or were not made recklessly, or they were immaterial to a finding of probable cause. Most of what the defendants characterize as unlawful misrepresentations are, in fact, reasonable inferences and interpretations which can be drawn from a review of all the tapes and an understanding of the statements in the entire context of the series of conversations among the participants.

It is unnecessary to address each of the arguments and allegations raised by the defendants, but a few examples will illustrate my views. In paragraph 20 of the affidavit, the affiant describes a conversation between Hauser and Marcello in which Hauser allegedly asks Marcello if Marcello has any "juice" with the New Orleans City Council that might assist Hauser in winning an insurance contract for the city's public employees. According to the government's affidavit, Marcello replied: "Yes, I've got 'em all where I want 'em." Defendants contend that Marcello's actual response was: "Yeah, I got them all what I want." I have listened to the tape recording of this particular conversation more than 12 times, and I conclude that it is possible to hear the statement either way and I am not now positive which is correct. In considering the remark in the context of the entire conversation and the series of conversations represented by the tapes that were admitted into evidence, however, I believe that the interpretation placed upon the conversation by the affiant is an accurate one. The inference arising from the conversation that Marcello exercises influence over the decisions of the council is a reasonable one based on a review of the entire conversation that supports the finding of probable cause. Similarly, the defendants challenge the use in paragraph 24 of the affidavit of the phrase "inside information" to describe information Marcello allegedly would provide to Hauser concerning bidding for insurance contracts for Jefferson Parish public employees. The defendants argue that the government affidavit has in fact placed a sinister hue on what in reality was an offer to obtain perfectly legitimate information, such as bid specifications for the parish insurance business. While it is true that the phrase "inside information" does not appear on the recording of the conversation upon which this paragraph of the affidavit is based, it is clear to me from my review of the exchange in the context of the entire conversation that the affiant's characterization of the conversation was a reasonable and accurate one.

Perhaps the most serious misrepresentations raised by the defendants concern paragraphs 23 and 28 of the affidavit. In paragraph 23, the affidavit states that while discussing the Jefferson Parish insurance contracts during an April 2, 1979 conversation, Hauser said that once the contract was obtained, " 'we'll pay who we have to pay' and Marcello verbally agreed." I agree with defendants that the phrase "we'll pay who we have to pay" does not appear on the tape. In fact, Walker admitted as much when he testified during the hearing. I conclude, however, that the placement of quotes around the disputed phrase was not done in reckless disregard of the truth since a review of the entire conversation indicates that paragraph 23 is an accurate conveyance of the meaning of what was said in that conversation. The actual exchange on which this paragraph was based appears to have been Hauser saying that "whatever we have to take care of we'll take care of" and Marcello responding "That's all." It is important, I believe, not to view these brief verbal exchanges in a vacuum; instead, they can only properly be understood and interpreted when heard in the context of the relevant conversation as a whole. While the actual words presented to the magistrate in the affidavit were inaccurate, the magistrate was not misled because the paragraph accurately reflected what the conversation, viewed as a whole, was all about. In paragraph 28, the affidavit describes an April 7, 1979 conversation between Hauser and Davidson. While the affidavit characterizes this paragraph as the summary of a taped conversation reviewed and analyzed by the affiant,

it is actually a summary of a telephone call monitored on an extension phone in Hauser's home by another FBI agent. *See* defendants' exhibit 35. Apparently, no recording of this conversation exists, although the magistrate apparently was led to believe that this paragraph was based on a recording. I find, however, that even if this paragraph is stricken from the affidavit, a sufficient basis for a finding of probable cause still exists in the remaining content of the affidavit.

■ I have reviewed each of the defendants' allegations of misrepresentations or omissions raised in their pre-trial motion papers, in their questioning and oral argument at the evidentiary hearing, and in the supplemental memorandum filed by defendant Roemer after the hearing. I have measured these allegations against what I have read in the affidavits and heard on the tapes, and I have weighed them against the applicable legal standards provided by the Supreme Court and the Fifth Circuit. I conclude that the defendants have failed to establish intentional or reckless misrepresentations or omissions in the affidavits which, when set to one side of the affidavits, render them insufficient to establish probable cause. Most of the alleged misrepresentations or omissions raised by the defendants are in fact accurate reflections or interpretations of the tape-recorded conversations when those statements or remarks are heard and understood in their proper context within the series of conversations relevant to these motions. Those few allegations that raise actual misrepresentations or omissions are either unintentional, not recklessly made, or have no effect on the sufficiency of the affidavit to support a finding of probable cause when deleted from the affidavit. Defendants' subfacial challenge to the sufficiency of the affidavits has therefore failed, and the motions to suppress on those grounds are denied.

### B) *Staleness*

An additional argument raised by the defendants in connection with the sufficiency of the findings of probable cause to wiretap is that the background information provided by Hauser in the first part of the affidavit should be stricken from the affidavit on grounds of staleness. Defendants contend that because the background information concerns events occurring from late 1975 to September 1976, it is stale information which cannot be used to support a finding of probable cause in the 1979 applications for wiretap orders. I disagree with the defendants' argument.

■ The staleness standard does not establish an arbitrary time limitation in which information must be presented to a magistrate. Instead, it is clear that in some circumstances "information which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity...." *United States v. Weinrich, supra,* 586 F.2d at 491. Staleness is an issue which must be decided on the peculiar facts of each case, but the rule allows "fairly long periods of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity." *United States v. Hyde, supra,* 574 F.2d at 865.

■ In this case, the facts set out in the affidavit describe similar kinds of criminal activity occurring in 1976 and again in 1979 among persons who appear to have had a longstanding and ongoing relationship. Moreover, the older information set out in the background portion of the affidavit is corroborated in many respects by the information obtained from the consensual tape recordings made in 1979. Under these circumstances, it was not unreasonable for the judges who issued the intercept orders to conclude that the relationships and activity described in the affidavits was ongoing and continuing, and I will not disturb their findings of probable cause to issue intercept orders on grounds of staleness.

### C) *The Statutory Requirements*

At various points in their motions, defendants have sought to suppress the tape

recordings made pursuant to court orders on grounds that the government failed to comply with some of the statutory requisites established by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* Included among defendants' arguments are that (1) the orders are insufficient on their face; (2) the government failed to "minimize the interception of communications not otherwise subject to interception" pursuant to 18 U.S.C. § 2518(5); (3) the orders failed to particularly describe the communications sought to be intercepted pursuant to 28 U.S.C. § 2518(4); (4) the government provided an insufficient justification for the need for electronic surveillance and failed to try other investigatory techniques before resorting to wiretapping as required by 18 U.S.C. § 2518(1)(c); (5) the government failed to comply with the sealing requirements of 18 U.S.C. § 2518(8)(a); and (6) unauthorized disclosures were made to the grand jury in violation of 18 U.S.C. § 2517(5).

I have been provided with no evidence to support any of the defendants' allegations, and my own examination of the orders and the relevant parts of the record in this case convinces me that all requirements of 18 U.S.C. § 2510 *et seq.* have been complied with by the government. Defendants' motions to suppress on these grounds are therefore denied.

D) *Miscellaneous Arguments*

Defendants have also raised several miscellaneous arguments in support of their contentions that the tapes made pursuant to court-ordered wiretaps are inadmissible. These arguments include (1) the statute authorizing the wire interceptions, 18 U.S.C. § 2510 *et seq.*, is unconstitutional; (2) the application failed to include a statement of facts relating to previous interceptions of the defendants' communications; (3) unau-

thorized interceptions of defendants' conversations were made; and (4) the intercept orders are "irretrievably tainted" under the doctrine of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). I conclude that all of these arguments are without merit, and that the motions to suppress the court-ordered wiretaps on these and any other grounds asserted by the defendants are denied without need for further discussion.

VI. *Motion to Disclose Identity of Informer*

Near the end of August 1980, a sealed envelope was delivered to the office of the attorney-in-charge of the Justice Department's New Orleans Organized Crime Strike Force.[7] The only identification contained on the envelope was a telephone number scrawled on the outside. The attorney-in-charge opened the envelope and found a spiral looseleaf notebook containing telephone call logs and appointment notations. The notebook apparently belonged to defendant Marcello. The attorney turned over the notebook and the telephone number to an FBI agent who after calling the telephone number on the envelope arranged to meet with the person who answered. They met on five occasions in August and early September 1980 and the agent received eleven additional notebooks, all containing information similar to that in the first notebook and all apparently belonging to defendant Marcello. The notebooks contained information about appointments and telephone calls dating from 1970 to 1977, and the government officials reviewed the notebooks and determined that they were irrelevant to the BRILAB prosecution and would not be used at trial.

On October 2, 1980, counsel for defendant Marcello was summoned to the Office of the United States Attorney for this District. When he arrived, he was given the twelve

---

**7.** The factual narrative that comprises the first three paragraphs of this section of my minute entry is based on the testimony of the witnesses who testified at the evidentiary hearing conducted on this motion. The witnesses were *Russell Schonekas, counsel for defendant Mar-* cello; Eades Hogue, attorney-in-charge of the Justice Department's New Orleans Organized Crime Strike Force; John Volz, United States Attorney for the Eastern District of Louisiana; and Special Agent Harold Hughes of the New Orleans office of the FBI.

notebooks. Government representatives declined to identify the source of their information since the informer had requested anonymity because of fear of reprisals.

The notebooks were personal property of Marcello which had been stolen in an August 30, 1977 burglary of his business office and reported to the Jefferson Parish Sheriff's Office. The FBI was aware that Marcello had reported a burglary, and when the informer provided the FBI with the twelve notebooks, he was questioned about his knowledge of the burglary. According to the FBI agent who met with the informer, the informer denied that he had committed the burglary and denied that he knew the identity of the burglar.

Defendant Marcello has brought this motion to require the FBI or the government attorneys (1) to disclose the name and address of the informer who provided the government with the notebooks allegedly taken in the burglary, and (2) to state (a) whether they know the identity of the burglar, (b) whether the government participated in or was responsible in any way for the burglary, and (c) whether they have reviewed or examined the notebooks and plan to use them at the trial of this case. Counsel for the defendant agreed at oral argument on this motion that the government had satisfied the second part of this motion. Each of the government officials who testified at the evidentiary hearing on this motion denied that the government perpetrated the burglary or was in any way involved, and also denied that any government official knows the identity of the burglar. Some of the government officials admitted they had examined the notebooks, but the Strike Force attorney-in-charge testified that they were irrelevant to the BRILAB case and would not be used at trial. Thus, the only portion of defendant's motion that remains to be decided is defendant's request for disclosure of the identity of the informer who provided the government with the notebooks. Defendant's legal theory in support of his motion is rather vague; his very brief memo in support of the motion states simply that he "relies upon the 5th and 14th Amendments to the

U.S. Constitution and Rule 47 of the Federal Rules of Criminal Procedure." Counsel's oral argument following the evidentiary hearing seemed to touch on notions of fundamental fairness inherent in the Fifth Amendment. Defendant cites no case law in support of his motion.

▮▮▮▮ Although the government is required to disclose the identity of confidential informers under some circumstances, there is no general requirement that an informer's identity be disclosed in all cases. *See Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). In *Roviaro*, the Supreme Court provided the following general guidance on the "informer's privilege:"

What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law. The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

The scope of the privilege is limited by its underlying purpose....

A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. *Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.* In these situations the trial court may require disclosure....

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow

of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

353 U.S. at 59–62, 77 S.Ct. 627–29 (citations omitted) [emphasis added]. In general, therefore, disclosure of an informer's identity will be ordered when the informer's identity is relevant, helpful to the defense, or essential to a fair determination of the case.

 In this case, disclosure of the informer's identity will serve none of these purposes. Defendant has failed to demonstrate the relevance of this informer's identity to this case and his defense, and I discern none. The identity of the informer, who provided information which itself is irrelevant to this case, is in no way essential to determination of this proceeding, nor would it be helpful to the defense of these charges. The informer apparently fears revelation of his or her identity and obviously would not have come forward except under the cloak of anonymity explained in *Roviaro*. Under these circumstances, the balance of interests weighs in favor of continued confidentiality, and I therefore deny defendant's motion for disclosure.

### ORDER

SEAR, District Judge.

IT IS ORDERED that defendants' motions to adopt the substantive motions and motions to suppress of their co-defendants are GRANTED.

IT IS FURTHER ORDERED that the defendants' motions to dismiss the indictment in the captioned proceeding on grounds of governmental misconduct and overreaching, artificially created jurisdiction, and selective prosecution are DEFERRED until trial. Defendants' motion to dismiss the indictment on grounds of prejudicial publicity is DENIED, but defendants' alternative motion for sanctions is DEFERRED.

IT IS FURTHER ORDERED that all other substantive motions urged by defendants in arguments conducted October 6 and 7, 1980, including the motions to sever, to dismiss, and to strike portions of the indictment, are DENIED.

IT IS FURTHER ORDERED that the defendants' motions to suppress the consensually recorded tapes of defendants' conversations and the tape recordings made pursuant to court orders, which motions were urged and argued December 8 through 12, 1980, are DENIED. The motion of defendant Marcello for disclosure of the identity of a government informer is also DENIED.