**UNITED STATES of America**

v.

**Carlos MARCELLO et al.**

**Crim. A. No. 80–274.**

United States District Court,
E. D. Louisiana.

April 20, 1982.

John Volz, U. S. Atty., L. Eades Hogue, U. S. Justice Dept., Albert Winters, Richard T. Simmons, Asst. U. S. Attys., John Voorhees, U. S. Justice Dept., New Orleans, La., for Government.

Arthur A. Lemann, III, Provino Mosca, Russell Schonekas, New Orleans, La., Henry Gonzalez, Tampa, Fla., for defendant Carlos Marcello.

John R. Martzell, John Wilson Reed, Michael Fawer, Mathew Greenbaum, New Orleans, La., for defendant Charles E. Roemer, II.

SEAR, District Judge.

*Introduction*

Following their convictions in this federal criminal prosecution, defendants Carlos Marcello and Charles E. Roemer, II, moved for judgments of acquittal or, in the alternative, for a new trial on a number of grounds. After considering the extensive memoranda submitted by counsel and the oral argument presented at the hearing of December 14, 1981, in light of the substantial record of the case and the voluminous evidence adduced at trial, I denied the defendants' motions, ruling orally from the

bench. At the same time, I also denied four motions which had been argued by the defendants prior to trial, but whose determination had been deferred until trial. *See United States v. Marcello,* 508 F.Supp. 586, 590–98 (E.D.La.1981).

*Background of the Case*

In the summer of 1980, Marcello and Roemer were charged with three co-defendants in a lengthy twelve-count indictment resulting from a year-long Justice Department undercover "sting" operation commonly known as Brilab.[1] The Brilab investigation was nationwide and broad in scope, centering upon suspected illegal activities involving public officials, labor unions and reputed organized crime figures. The investigation was carried out by agents of the Federal Bureau of Investigation working with a convicted felon and career con man named Joseph Hauser. Hauser had recently pleaded guilty to federal criminal charges arising from a scheme to swindle health, welfare and pension funds from labor unions, *United States v. Hauser,* No. CR–78–313 (D.Ariz. Feb. 5, 1979). He willingly agreed to cooperate with federal officials when approached at about the time of his guilty plea by FBI agents who proposed that he participate in the undercover operation.[2] Hauser's agreement to cooperate in the investigation was not entirely motivated by the spirit of penitence or by a sense of civic obligation. In exchange for his participation in the Brilab investigation, Hauser received the assistance of Justice Department attorneys who appeared on his behalf in his Arizona sentencing, substantial compensation payments in addition to reimbursement for expenses and other fringe benefits during his participation in the Brilab investigation, and a place in the federal witness protection program when his term of imprisonment resulting from his criminal conviction ended.

The Louisiana arm of the Brilab operation in which Hauser became involved lasted about one year, from February 1979 to February 1980, a period during which the 1979 gubernatorial campaign and election were conducted. As part of the undercover investigation, Hauser and two FBI agents, Michael Wachs and Larry Montague, posed as representatives of a fictitious Beverly Hills, California firm called Fidelity Financial Consultants. Wachs, who assumed the alias Michael Sachs, and Montague, who took the name Larry Golden, working together with Hauser, set up their dummy business on the West Coast. Personalized business cards and stationery showing that they represented Prudential Insurance Company of America, one of the largest insurance firms in the world, were printed by the FBI.[3] Posing as insurance representatives with a connection to Prudential, Hauser and the two agents contacted individuals with whom Hauser said he had dealt in the past, including Carlos Marcello, in an effort to gain a foothold for obtaining insurance contracts with state and local governmental agencies and private businesses in Louisiana. The agents' activities

1. The term "Brilab" is an acronym which stands for "bribery-labor." Ironically, the Louisiana component of the Brilab investigation in no way implicated labor unions or their officials in any alleged or actual wrongdoing uncovered by the investigation.

2. Hauser testified at trial that he was initially approached about cooperating in the investigation by FBI agents William Wiechert and William Fleming. *See* Trial Testimony of Joseph Hauser under Direct Examination by the Government, June 15, 1981, Trial Transcript at 4208–12.

3. Government exhibit No. 309. John Stoddart, senior vice president and general counsel of Prudential, testified that although Prudential had agreed to cooperate with the government in the Brilab investigation, the printing of business cards bearing the inscription "Fidelity Financial Consultants Representing Prudential Insurance Company of America" and listing an agent's alias, address, and telephone number was in conflict with assurances Prudential had received from the FBI in May 1979 that there would be no "advertising" of a connection between Prudential and Fidelity. *See* trial testimony of John Stoddart under direct examination by defendant Marinello, July 23, 1981, Trial Transcript at 9097–9119. Interestingly, the name Prudential Insurance Company was printed on the business cards in boldface type at least twice as large as the lightface printing used for the name Fidelity Financial Consultants.

included face-to-face meetings with Marcello, several candidates for public office, and Roemer, who was then Commissioner of Administration of the state of Louisiana and chief of the gubernatorial campaign of then-State Senator Edgar G. "Sonny" Mouton of Lafayette. Scores of tape recordings of conversations concerning the election campaign, insurance, and the activities of the agents and the defendants were made with Hauser's consent[4] or pursuant to wiretap orders previously issued by United States district judges.[5] More than 130 of the surreptitiously made recordings were eventually used as evidence at the Brilab trial. The agents made cash payments of thousands of dollars to several candidates or their representatives. Roemer himself received two payments totalling $25,000, which he contended were campaign contributions for Mouton. In the indictment that formed the basis for this criminal prosecution, however, the payments were characterized as bribes given in return for Roemer's promise to use his influence to shift the state employees insurance contract from its existing carrier to the agents.

Count One of the superseding indictment[6] that resulted from the Brilab investigation charged Marcello, Roemer, I. Irving Davidson, Vincent Marinello, and Aubrey Young with a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(d).

Specifically, the defendants were charged with conspiring to associate together in fact as an enterprise for the purpose of obtaining the state employees insurance contract through the commission of various criminal acts, including public bribery in violation of Louisiana law, La.Rev.Stat.Ann. § 14:118 (West Supp.1980); interstate travel with intent to conduct unlawful activity in violation of 18 U.S.C. § 1952; wire fraud in violation of 18 U.S.C. § 1343; and mail fraud in violation of 18 U.S.C. § 1341. Count Two charged all five defendants with a substantive violation of RICO. Counts Three through Twelve alleged various acts of mail fraud, wire fraud, and interstate travel in aid of unlawful activity against some or all of the defendants.

After eighteen weeks of trial, the jury found Marcello and Roemer guilty of Count One, the RICO conspiracy. Marcello was acquitted on the eleven other counts against him, and Roemer was acquitted of the five other charges against him.[7] Their co-defendants were acquitted on all charges against them.[8]

Prior to the trial, I had deferred ruling on three motions brought by the defendants to dismiss the indictment on grounds of governmental overreaching or misconduct, selective prosecution, and artificially created federal jurisdiction,[9] an issue raised with

4. See 18 U.S.C. § 2511(2)(c) and (d); United States v. Marcello, 508 F.Supp. 586, 598–601 (E.D.La.1981).

5. See 18 U.S.C. § 2510 et seq.

6. Two indictments were actually returned. Each contained essentially the same charges, but the first, returned on June 17, 1980, Court Record Document No. 1, named only four defendants while the second, a superseding indictment returned on August 12, 1980, Court Record Document No. 56, named a fifth defendant, Aubrey W. Young.

7. Roemer was acquitted of Counts Nine and Eleven, both involving wire fraud charges, when I granted his motion for entry of judgment of acquittal as to those counts pursuant to Rule 29(a), Fed.R.Crim.Pro., on July 7, 1981 at the close of the government's case-in-chief. The jury acquitted him of Counts Two, Ten and

Twelve. The jury acquitted Marcello on Counts Two through Twelve.

8. Davidson was acquitted of all twelve counts against him by the jury. Marinello was acquitted of Count Eleven on July 7, 1981 when I granted his motion for entry of judgment of acquittal as to that count pursuant to Rule 29(a), Fed.R.Crim.Pro. The jury acquitted him of Counts One, Two and Twelve. Young was acquitted of all counts alleged against him in the indictment when I granted his motion for entry of judgment of acquittal pursuant to Rule 29(a) on July 7, 1981.

9. In their pre-trial motions, the defendants had also sought dismissal of the indictment on grounds that they were prejudiced by government-initiated leaks to the news media prior to and during the grand jury investigation that led to their indictment. I denied their motion to dismiss, but deferred ruling on their alternative

renewed fervor in defendant Roemer's post-trial motion for judgment of acquittal. The rulings were deferred primarily so that my determination would be based on a complete evidentiary record and a complete understanding of the facts of this complex case without the necessity of conducting extensive and redundant pre-trial hearings that would have duplicated much of the evidence to be presented at the anticipated lengthy trial. *United States v. Marcello, supra,* 508 F.Supp. at 594. Although the defendants were provided an opportunity at the post-trial hearing conducted on December 14, 1981 to present any further evidence relevant to their pre-trial motions,[10] no additional evidence was presented at that time and the defendants rested their motions on the substantial record developed at trial. After the trial, the convicted defendants filed lengthy post-trial motions[11] which were scheduled for hearing and argument on December 14, 1981 along with the deferred motions. In addition to the previously raised issue of artificially created federal jurisdiction, the post-trial motions included the following three general arguments: (1) The evidence presented during the trial was insufficient to support the RICO conspiracy conviction because no actual agreement to commit the requisite second predicate offense was proved; (2) The jury instructions concerning certain elements of the RICO conspiracy conviction were insufficient; and (3) The government failed to prove either the existence of an "enterprise" separate from the alleged predicate offenses or a "pattern of racketeering activity" as that term is defined by the RICO statute.

*Governmental Overreaching and Artificially Created Federal Jurisdiction*

The defendants' allegations of governmental misconduct or overreaching and artificially created federal jurisdiction share common legal and factual bases and require substantially similar proof. Both claims touch upon the conduct of government agents in the instigation, operation and maintenance of alleged criminal offenses during the Brilab investigation. Both require examination of the specific activities of these government agents in an undercover operation, which, by its nature, required a degree of government participation, and both seek to define the boundary between permissible and impermissible governmental involvement.

In their motions to dismiss on grounds of governmental misconduct and overreaching, the defendants contend that the government's involvement in the Brilab scheme was so pervasive and outrageous that due process principles or the court's supervisory power over the criminal justice system require that the indictment against them, and their resulting convictions based on that indictment, be dismissed. Although the Supreme Court has never applied the defense of outrageous governmental misconduct in a specific case to dismiss an indictment or vacate a conviction, it has recognized that a situation may arise "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). In order for the defense to be invoked successfully, the egregious conduct of the law enforcement agents must be violative of our concepts of fundamental fairness and the universal sense of justice embodied in the due process clause. *Id.* In a concurring opinion in *Hampton v. United States,* 425 U.S. 484, 495 n.7, 96 S.Ct. 1646, 1653 n.7, 48 L.Ed.2d 113 (1976), Justice Powell stated that in order for the defense to be invoked successfully in

motion for sanctions against the government. *See United States v. Marcello,* 508 F.Supp. 586, 598 (E.D.La.1981). My ruling on the defendants' alternative motion for sanctions is discussed at pages 1378–79.

**10.** *See* Court Record Document No. 463, at 4–5.

**11.** *See* Court Record Documents No. 448, 548, 549, 557. Counsel for defendant Marcello also indicated his desire to adopt the arguments set forth in defendant Roemer's motion and memoranda.

any given case, "police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction."

Several courts of appeals have established that in some circumstances convictions obtained through egregious governmental misconduct in the creation and maintenance of criminal activities must be vacated. *See United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). Other courts, while recognizing the validity of the defense, have noted that it is one that "would rarely, if ever, be available." *United States v. Brown*, 635 F.2d 1207, 1212 (6th Cir. 1980), *quoting United States v. Leja*, 563 F.2d 244, 246 n.4 (6th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978). The Fifth Circuit has acknowledged that a defense of governmental misconduct grounded on concepts of due process and existing separately from the traditional defense of entrapment is available in some circumstances, *United States v. Meacham*, 626 F.2d 503, 512 (5th Cir. 1980); *United States v. Graves*, 556 F.2d 1319, 1324 (5th Cir. 1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978), but in no case has the Fifth Circuit yet reversed a conviction on that specific ground.

The defendants' motions to dismiss on grounds of artificially created federal jurisdiction have two basic components, one asserted pre-trial in very general terms, and the other argued post-trial and addressed to specifics. In their motions raised prior to trial, the defendants contended that the overinvolvement of government agents in the scheme resulted in the creation and maintenance of the interstate commerce elements of the offenses charged in the indictment. For example, the defendants argued pre-trial that because the California

firm set up by the FBI was a purely fictitious operation through which insurance contracts could never have been written, there could be no effect on interstate commerce in reality through the dealings of the defendants with the agents. In their post-trial motions, the defendants have refined their argument, concentrating on specific evidence adduced at trial which they contend demonstrates the government's creation of the federal jurisdictional elements of the mail and wire fraud offenses that serve as predicate acts to the RICO conspiracy of which they were convicted. The defendants argue that the government agents themselves created and caused the November 2, 1979 mailing which forms the basis of the mail fraud predicate offense and that the government manipulated the cross-country travels of government informer Joseph Hauser and the undercover agents in such a way as to create the necessity for interstate telephone calls the defendants caused or made to Hauser or to the agents in furtherance of the scheme.

While the Fifth Circuit has never vacated a conviction on grounds of artificially created federal jurisdiction, it has recognized the legitimacy of the defense. *United States v. Perrin*, 580 F.2d 730, 737 (5th Cir. 1978), *aff'd*, 444 U.S. 37, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979). The defendants, however, have relied principally on the decision of the Second Circuit in *United States v. Archer, supra*.[12] In *Archer*, federal and local law enforcement officers created an undercover operation to investigate suspected corruption and public bribery in the New York City criminal justice system. Two convictions under the Federal Travel Act, 18 U.S.C. § 1952, resulted, but the Second Circuit vacated those convictions finding "manufactured federal jurisdiction" in a situation in which "the federal officers themselves supplied the interstate element and

---

12. The defendants have also placed some reliance on the opinion of the district court in *United States v. Jannotti*, 501 F.Supp. 1182 (E.D.Pa.1980), *see* Court Record Document No. 548 at 44–45, in which the district judge vacated two convictions obtained as a result of the Abscam investigation, another Justice Department "sting" operation conducted at about the same time as the Brilab investigation. The district court's decision has now been reversed, however, by the United States Court of Appeals for the Third Circuit, 673 F.2d 578 (3d Cir. 1982).

acted to ensure that an interstate element would be present." *United States v. Archer, supra,* 486 F.2d at 682.

Federal jurisdiction in the *Archer* case was based primarily on three interstate or foreign telephone calls allegedly made or received by the defendants in furtherance of the bribery scheme. The first call involved a defendant in New York who returned a telephone call made by a government agent in New Jersey. The court discarded this call as a legitimate basis for finding federal jurisdiction because the agent admitted he had gone to New Jersey for the sole purpose of getting the defendant to talk in an interstate phone conversation. *Id.* at 674, 681–82. The second call involved attempts by a defendant in New York to reach a government agent at a Las Vegas, Nevada hotel. The court rejected these unsuccessful attempts to reach the agent in Las Vegas because the calls "resulted from a plant of misinformation" which provoked calls that the defendant would not otherwise have made and because the agent knew that any attempt by defendant to reach him at the hotel would be fruitless because the agent would not be at the hotel and "there was not and, under the circumstances, could not have been any actual use of a facility in interstate commerce which would in fact promote, etc., any unlawful activity." *Id.* at 682. The third call was from a government agent, who was in Paris, France on a legitimate, though unrelated, investigation, to a defendant in New York. Although the government agent had not been sent abroad for the sole purpose of making a foreign call that would serve to create federal criminal jurisdiction, the court rejected it because the call was a casual and incidental occurrence which served no real purpose in furtherance of the scheme and had in no way been initiated by the defendant. *Id.* at 682–83. On rehearing, the *Archer* court

adhered to its decision reversing the convictions and dismissing the indictment, but limited somewhat the broad language it had used in rendering its initial opinion by noting that it had gone "no further than to hold that when the federal element in a prosecution under the Travel Act is furnished *solely by undercover agents,* a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves. . . ." (emphasis added). *Id.* at 685–86.

■ The use of paid informants and undercover operatives, like those employed in Brilab, is, of course, a legitimate and permissible law enforcement technique and means of investigation. *See United States v. Russell, supra,* 411 U.S. at 432, 93 S.Ct. at 1643. Only when the specific acts of such government agents[13] reach "a demonstrable level of outrageousness," *Hampton v. United States, supra,* 425 U.S. at 495 n.7, 96 S.Ct. at 1653 n.7, or result in manufactured jurisdiction should convictions obtained as a result of such investigative techniques be vacated. The government's involvement in the Brilab scheme was undeniably extensive. When that involvement is viewed as a whole, however, I find that it was not so unusually pervasive as to violate those notions of justice and fair play embodied in our concept of due process and necessary for the proper administration of our criminal justice system. Moreover, federal jurisdiction was not created solely and impermissibly by the activities of government agents in the manner prohibited by the *Archer* case.

Even those isolated government actions during Brilab that, in my view, come closest to being included in the category of activities prohibited by the cases discussed above were insufficient to require setting aside these convictions. For example, on at least two occasions, Hauser's voice could be heard during tape-recorded conversations in

---

**13.** The activities of Hauser, a paid government informer, are considered those of a "government agent" for purposes of the defenses of governmental overreaching or outrageous misconduct and artificially created federal jurisdiction. *See United States v. Brown,* 635 F.2d 1207 (6th Cir. 1980); *see also Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (activities of government informer considered those of government agent for entrapment purposes).

which, the defendants contend, Hauser was attempting to implicate others in criminal activity even though the general conversations themselves were innocent.[14] On June 28, 1979, Hauser stepped into a restroom alone during a meeting with Marcello and Davidson at Marcello's Metairie, Louisiana office. The meeting occurred very early in the Brilab investigation before the details of the RICO conspiracy of which Marcello and Roemer were convicted had begun to emerge. While still alone, Hauser said:

> Carlos, I'm listening. And I'm reading the papers. I understand what you're saying. Okay. I'm gonna read what you're showing me. So in a sense what you're saying is that you're taking over the whole family. Oh, then we can write business throughout the country. I'm, I'm reading. Okay, I'll read it. Lemme finish reading this. You mean to tell me something like this they distribute in the mail? Oh, I see. By messenger. (long pause) (time reduced) I never realized numbers were such a big game.[15]

On November 11, 1979 during a meeting between Hauser and gubernatorial candidate Louis Lambert, who was then a member of the Louisiana Public Service Commission, Lambert had clearly left Hauser alone while Lambert left the room to gather some testimonial tickets he planned to sell in exchange for $10,000 in cash that Hauser was prepared to deliver to him. While they were together in the room, the conversation proceeded in part as follows:

> Lambert: What do you want to contribute to my campaign?
>
> Hauser: I want to give you ten thousand dollars cash right now.

> Lambert: And I'm gonna give you, let me tell you what I'm doing so you can just (unintelligible) .... Wait, right ... til I go get some tickets.
>
> Hauser: Oh, leave me alone, give them to L. G. Moore, leave me alone.
>
> Lambert: You take the goddamn tickets and then we've done it the right way.
>
> Hauser: Okay.
>
> Lambert: That scares you, but you just have to learn we've got a new policy.[16]

At this point in the conversation, the sound of footsteps—Lambert's footsteps leaving the room—and the sound of a door opening and closing are clearly audible on the tape recording. Hauser, now momentarily alone in the room, takes the opportunity to inject a word that had not previously been used in the discussion:

> Hauser: I want it understood one thing. That's part of the business. I, I call it a *kickback*, you can call it anything you want.[17]

At that point, the sound of a door opening and closing and the sound of footsteps—Lambert's footsteps re-entering the room—are clearly audible on the tape, and Hauser, his solo remarks interrupted in mid-sentence by Lambert's return, concludes:

> You want to call it this ... you just get this ... okay.[18]

Although Hauser denied on the stand that he was fabricating evidence or that Lambert was out of his presence when he made these statements,[19] it is obvious from listening to the tapes that Hauser was in fact alone.

While Hauser's conduct in these two instances was disreputable and cannot be condoned, it clearly bore no relationship to the

**14.** Hauser's extemporaneous remarks on these occasions and others were referred to as the "Hauser soliloquies" by counsel during the trial.

**15.** Government exhibit 23–T, government transcript at 26; tape played in court during testimony of William Fleming under cross-examination by defendant Marinello, May 12, 1981, and during testimony of Joseph Hauser under cross-examination by defendant Roemer, June 19, 1981.

**16.** Defense exhibit, denominated "defense tape" in government exhibit transcript book, at 60; tape played in court during testimony of Joseph Hauser under cross-examination by defendant Roemer, June 19, 1981.

**17.** *Id.* (emphasis added).

**18.** *Id.*

**19.** Trial testimony of Joseph Hauser under cross-examination by defendant Roemer, June 19, 1981, Trial Transcript at 4769–77.

offense for which the defendants Marcello and Roemer were convicted. The strength of the connection, or causal relationship, between the challenged government conduct and the commission of the acts for which the defendants stand convicted is a consideration which several courts have deemed important in evaluating a defense of egregious governmental misconduct. *United States v. Brown, supra*, 635 F.2d 1207, 1213; *United States v. Spivey*, 508 F.2d 146, 149–150 (10th Cir.), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. Szycher*, 585 F.2d 443, 447–49 (10th Cir. 1978). Moreover, Hauser's soliloquies are not symptomatic of a broader pattern of governmental misconduct in the Brilab investigation. Instead, they were isolated events of the general type against which Hauser had been warned by federal law enforcement officers working with him in the investigation.[20]

The defendants also contended that the government's overinvolvement in the Brilab scheme is illustrated by the allegedly substantial role played by Justice Department officials and investigating agents in planning both the general contours and the specific details of Brilab. Hauser and FBI agents Wachs and Fleming were all questioned about whether they attended meetings with, or received instructions from, Justice Department officials about how, why, and against whom the Brilab investigation should be conducted. Yet, I find no convincing evidence to support defendants' contentions concerning the existence of a government masterplan that comprises outrageous overreaching or misconduct in this case. In questioning Fleming, for example, counsel for defendant Roemer made reference to an internal FBI memorandum dated March 22, 1979 originating from the Los Angeles field office of the FBI and addressed to the FBI director.[21] The memorandum requested permission to institute a widespread undercover operation, Brilab, "to criminally involve" labor officials whom Hauser alleged had been involved in bribery in the past. No extensive questioning regarding the memorandum took place, and it was not offered in evidence. Although the memorandum used the facially suspicious phrase "to criminally involve," Fleming and the other government agents who testified denied that instigation of criminal activities was the motivation behind the Brilab investigation or that they had received detailed instructions from Washington on how to proceed, and I find that their actions during the more than year-long investigation support this view. Moreover, examination of the memorandum as a whole [22] read in context indicates that the investigation at that early stage merely contemplated having Hauser recontact individuals with whom he said he had illicit dealings in the past so that the FBI could legitimately investigate those dealings through the medium of Hauser's renewal of past relationships. The fact that the agents eventually became involved in an investigation of corrupt practices in the obtaining of state insurance contracts relating to the Louisiana gubernatorial campaign and the Office of the Commissioner of Administration, a direction and development clearly unanticipated when the Brilab investigation was germinating in early 1979, further illustrates that it was the defendants themselves, and not the government, who were the architects of the specifics of the offense for which they were eventually convicted.

---

**20.** *See* trial testimony of William Fleming under direct examination by the government, May 7, 1981, Trial Transcript at 31–32.

**21.** Trial testimony of William Fleming under cross-examination by defendant Roemer, May 11, 1981, Trial Transcript at 433–40.

**22.** The memorandum was part of a voluminous collection of documents produced by the government for my *in camera* inspection pursuant to a broad request by the defendants for access to exculpatory material which they might be entitled to receive pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. After examining the memorandum, I ordered it produced to the defendants solely because of the use of the phrase "to criminally involve" and because of the possibility that the phrase might somehow prove exculpatory in light of some additional evidence the defendants might produce. No such evidence was in fact produced at trial or during the other hearings conducted in this matter.

The events surrounding the mailing of November 2, 1979 and the various interstate telephone calls made or caused by the defendants in furtherance of the scheme, particularly the call from Marcello to Hauser of September 21, 1979, are relevant to the issues of both outrageous governmental misconduct and artificially created federal jurisdiction.

On September 21, 1979, Marcello made a long distance telephone call from Metairie, Louisiana, to Hauser at a motel in Albuquerque, New Mexico. Earlier that day, Marcello and Roemer had met at the St. Ann Hotel in New Orleans where, according to Roemer's testimony,[23] Roemer agreed to meet with Hauser and the agents. The sole purpose of the call was for Marcello to arrange that meeting:

Marcello: Okay, I just come from seein' that man (Roemer).

Hauser: Uh huh.

Marcello: Now he said them boys (the agents) are supposed to take out some deals, ya know? Come up with somethin'.

Hauser: Uh huh.

Marcello: Uh, that he could see what he can do, ya know?

Hauser: Uh huh.

 * * * * * *

Marcello: Yeah, but he got to show, you got to show uh what reason and all, I mean uh the boys *gotta come on down.* They got his number haven't they?

Hauser: Who?

Marcello: Your boys.

Hauser: Yeah, what ya mean his number, yeah.

Marcello: His telephone number.

Hauser: Yeah.

Marcello: So I can tell ya where, where we go, *you're gonna meet.*

Hauser: Okay.

Marcello: Ya understand? *Ya gotta meet Monday in Shreveport.*

Hauser: We gotta meet him Monday in Shreveport?

Marcello: Yeah.

 * * * * * *

Marcello: You come in Sunday. We'll talk Sunday night uh Monday morning.

Hauser: Okay.

Marcello: I'm gonna make ya reservations for Sunday for Monday evenin'. They get, go to Shreveport and I'll have your reservation there and all.[24]

Unlike the *Archer* situation, there is no evidence that the government arranged to have Hauser in New Mexico or prodded Marcello into making this call only as a means of providing federal jurisdiction. Brilab was a broad-based investigation in which Hauser traveled nationwide contacting individuals, including Marcello, with whom he had prior dealings. Both defendants knew at the time Roemer agreed to meet with Hauser and the agents and Marcello acted to schedule that meeting that Hauser's consulting operation was headquartered in California and that he would be traveling west at about the time any meeting would have to be arranged. Moreover, the call was an important one in furtherance of the scheme, not merely casually or incidentally related to obtaining the insurance contract, because it set up an important meeting between Roemer and the agents at which proposals for obtaining the contracts were to be discussed.

Similarly, the November 2, 1979 mailing of a written proposal concerning the insurance contract from the agents to Roemer was an event encouraged, and to some extent expected and approved, by the defendants. Throughout the course of their dealings with the agents, Marcello and Roemer had requested a written proposal from Hauser and the agents for Roemer's use in transferring the state insurance contract from its existing carrier to the agents. On November 1, 1979, Hauser and the agents brought a draft of the proposal to Marcel-

---

**23.** Trial testimony of Charles Roemer under direct examination, July 21, 1981, Trial Transcript at 8615–18.

**24.** Government exhibit 71–T, government transcript at 1–3 (emphasis added).

lo's office in Metairie. Because the proposal contained a typographical error, however, Hauser asked Marcello if Marcello's secretary would retype the letter for him. Apparently satisfied because Hauser had finally produced the written proposal he and Roemer had so often requested,[25] Marcello was pleased to oblige:

Hauser: Carlos, you know what I need?

Marcello: What?

Hauser: Can Loretta do me a big favor? I need a letter retyped.

Marcello: The girl's gone (unintelligible).

Hauser: Oh, she's gone already?

Marcello: Michael, was it a big, ah—

Hauser: Can she do it tomorrow?

Wachs: Yeah.

Marcello: You want it in the morning or you need it now?

Hauser: No, I don't need it now. (unintelligible)

Marcello: What you want (unintelligible).

\* \* \* \* \* \*

Hauser: This is a letter with proposals that we're sending to Roemer, and the word more was spelled with two r's and I didn't want to send it out this way, it looks like shit. You understand what I'm saying?

Marcello: Yeah, where's it at?

Hauser: Right there, nothing more, it's got two r's in it.

\* \* \* \* \* \*

Marcello: You don't need it 'til tomorrow?

Hauser: Oh, tomorrow's fine. I'll. I'll leave it with you. I'm leaving it with you anyway, man.

Marcello: Good.[26]

On the following day, again at Marcello's Metairie office, Hauser instructed Janice Decker, Marcello's secretary, on how the letter should be retyped.[27] The proposal[28]

was mailed after it had been retyped and Marcello had reviewed it approvingly:

Hauser: Carlos, just look at this. (Chair squeak). This is the letter, read, uh, the important part is the last—the second page.

Marcello: This your brief—you're sending this to Roemer.

Hauser: Yes.

Marcello: Oh the second page? (Pause— Paper Shuffle) Save 'em a million dollars, man. That's beautiful.

Hauser: Black and white. I'm quotin' them the number.

Marcello: Ya see that's what, that's what I'm sayin', ya see. You got something and ya think, maybe that Roemer should get this letter first, before I talk to him. Tell him ya got a letter, man, coming there. Or we gotta go to Baton Rouge. I don't know you gotta decide. Man, that's your line of business. It ain't me, ya know, Think it over. We got plenty of time but uh, we got to work fast.[29]

The actual mailing was arranged by Marcello's secretary and the agents in the following manner:

Decker: You want me to have him (Wachs) sign it?

Hauser: Let me have, let him sign it. Address the envelope and then ...

Decker: And I'll ...

Hauser: Then uh.

Decker: You want me to mail it to you?

Hauser: Would you mail it? I'd appreciate it very much.

Wachs: Sign it.

Decker: Yeah.

Montague: Express mail.

Hauser: No, she's gonna mail it.

Decker: If you mail it, ... I'll mail it at the Post Office today, it's okay.

---

**25.** See, e.g., portions of transcripts of tape-recorded conversations quoted in text at notes 31–35 infra.

**26.** Government exhibit 106–T, government transcript at 2–3.

**27.** See, e.g., Government exhibit 109–T, government transcript at 5–6.

**28.** Government exhibit 313.

**29.** Government exhibit 109–T, government transcript at 10–11.

Montague: Oh really. Okay that's fine.[30]

The defendants have characterized this sequence of conversations as evidence that the government orchestrated the mailing that provided federal jurisdiction for at least one of the RICO predicate offenses. This characterization ignores the general context provided by other evidence showing that the government's role in the mailing was not so extensive or outrageous that dismissal of the indictment or entry of a judgment of acquittal is required. The proposal was prepared and placed in the mail as a result of persistent requests by the defendants that Hauser and the agents provide Roemer with just such a written proposal. In their earliest meetings, Roemer had suggested that Hauser send him a written proposal concerning the insurance contract and made his assistant, Joseph Terrell, available to provide information needed for preparation of the proposal. As time passed and their discussions continued, Roemer began to press Hauser to send him the proposal. At a September 25, 1979 meeting in Baton Rouge, the following conversation took place:

> Roemer: Uh, I thought you was going to give me a proposition. I'm talking about a, what the, what you had to offer. You understand what I'm talking about?
>
> Hauser: Oh, I have a proposal the proposal. I'll have that when I come back Monday.
>
> Roemer: Okay.
>
> Hauser: A week from Monday.
>
> Roemer: Okay.[31]

On October 11, 1979, Roemer met Hauser again, this time in Lafayette:

> Roemer: Where's the damn paper you were going to have, I'm beginning to wonder about you fella.
>
> Hauser: Oh, man, I've been, I've been busy.

Roemer: Well I haven't so I just (unintelligible)

\* \* \* \* \* \*

Roemer: When can, when can you give me this proposal?[32]

Finally, in a November 2, 1979 conversation with Marcello, Roemer again presses to be sent a proposal:

> Roemer: Well I have been doin' my thing. Gettin' closer and closer to their thing, but I need to hear. I need to see somethin', what their proposal is.[33]

Marcello had also noted the importance of providing Roemer with a proposal in his telephone conversation with Hauser of September 21, 1979 in which he scheduled the meeting between the agents and Roemer,[34] and on November 2, 1979 he assured Roemer that the proposal he desired was on its way to Roemer.[35] Thus, the preparation of the proposal and the act of sending it to Roemer were more the result of the prodding and persistent requests of the defendants than of government planning or instigation.

Contrary to the argument of the defendants, Roemer did not specifically expect or insist that the proposal be personally delivered to him rather than mailed. In support of this contention, the defendants rely principally on the following conversation between Roemer and Hauser on October 11, 1979 in Lafayette:

> Hauser: . . . . I can have the proposal ready in the middle of next week. That's an intelligent answer.
>
> Roemer: Uh huh. Where do you go from here? Do you go from New Orleans from here or you going where?
>
> Hauser: I'm going to New Orleans from here and from then I'ma going to go back to LA for one day, draft the pro-

---

**30.** *Id.* at 8.

**31.** Government exhibit 77–T, government transcript at 8.

**32.** Government exhibit 102–T, volume 2, government transcript at 3.

**33.** Government exhibit 110–T, government transcript at 31.

**34.** Government exhibit 71–T, government transcript at 1–4.

**35.** Government exhibit 110–T, government transcript at 32.

posal, sit down with my actuaries, draft the proposal and I'm gonna either take a red eye from Houston here or stop in here and leave the proposal, eh . . . I could leave it with Carlos or could I leave it with Carlos and you could pick it up. Could that be possible?

Roemer: Whatever, whatever's convenient for you.

Hauser: That would be the best way if I were to shoot in on a plane and shoot right out.

Roemer: I could meet you at the airport if you like.

Hauser: Okay if you will. I don't want to impose on you . . . 'cause I know what you gotta do.

Roemer: Yeah.

Hauser: Look I appreciate your job. I did it in 1960, okay, so I know what you're doing. You don't have time to go to the bathroom.

Roemer: You, you can, you can get it to him, and he could get it to me. We got all kinds of ways.

Hauser: Okay, I'll get it to Carlos then. Okay, sometime in the middle of the week, 'cause I'm going to have a meet with Carlos on the Florida situation. I'm gonna have the, the thing, okay. . . .[36]

This conversation does not indicate, as defendants have contended, that Roemer was interested only in a personal delivery of the proposal and that the government manufactured the mailing only as a means of creating federal jurisdiction and an additional predicate offense for purposes of its RICO charge. The conversation shows merely an attempt by Hauser and Roemer to convenience each other, leaving a variety of possible methods of delivery open; it does not rule out use of the mails. Considered together with Roemer's numerous requests that he be sent a written proposal, it demonstrates Roemer's eagerness to receive the proposal by almost any means available. Moreover, there is ample evidence that

Marcello and Roemer in fact subsequently agreed to the mailing and approved it.[37]

In short, the conduct of Hauser and the investigating agents, when viewed as a whole and together with the activities and conduct of the defendants, was not impermissibly outrageous and did not result in the artificial creation of federal jurisdiction. Both defenses require a level of governmental misconduct that far exceeds the bounds of legitimate undercover law enforcement techniques. In my view, the evidence indicates that the government agents' activities did not vary so dramatically from the bounds of accepted and permissible law enforcement practices that the governmental overreaching or artificially created jurisdiction defenses could successfully be invoked. The evidence shows that the Brilab undercover operation in Louisiana merely afforded the opportunities and facilities for the commission of an offense. *See United States v. Russell, supra*, 411 U.S. at 4, 93 S.Ct. at 1644–45. The general thrust of the scheme, the specific direction it took, and the details of its execution, as well as the federal jurisdictional elements, were provided by the defendants. I conclude that viewed as a whole the conduct of the government in the Louisiana component of the Brilab investigation as it related to these two defendants does not require dismissal of the indictment or acquittal on grounds either of governmental overreaching or artificially created jurisdiction.

*Selective Prosecution*

 Having heard the evidence at trial, and having provided an opportunity post-trial for the submission of any additional evidence the defendants desired to present for my consideration, I conclude that Marcello's claim that the government engaged in arbitrary and discriminatory selective prosecution against him is also without merit. Because criminal prosecutions are generally presumed to have been undertaken in good faith and nondiscriminatorily,

---

**36.** Government exhibit 102–T, volume 2, government transcript at 4–5.

**37.** *See, e.g.,* portions of transcripts of tape-recorded conversations and text at notes 49–51 *infra.*

*United States v. Blitstein*, 626 F.2d 774, 782 (10th Cir. 1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); *United States v. Catlett*, 584 F.2d 864, 866 (8th Cir. 1978); *United States v. Falk*, 479 F.2d 616, 619 (7th Cir. 1973), the burden of proving discriminatory selective prosecution is on the defendant who raises the defense. In the Fifth Circuit, the defendant bears the heavy burden of establishing (1) that he has been singled out for prosecution while others similarly situated have not generally been proceeded against for similar conduct; and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.* based on such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. *United States v. Uni Oil, Inc.*, 646 F.2d 946, 953–54 (5th Cir. 1981); *United States v. Johnson*, 577 F.2d 1304, 1308 (5th Cir. 1978).

■ Marcello has completely failed to sustain the heavy burden imposed upon him by the jurisprudence concerning his claim of selective prosecution. At trial, counsel for Marcello elicited some testimony from two FBI agents assigned to the Brilab investigation that Marcello had for years been the subject of an open FBI file and the object of FBI surveillance[38] and is considered a leading figure in organized crime.[39] Reference was also made during the trial to a government effort in 1961 to deport Marcello to Guatemala using what can at best be characterized as legally questionable means.[40] No convincing evidence was presented, however, to support the defendants' contention that Brilab was designed to "get Marcello" or that Marcello's prosecution was motivated by government frustration over its inability either to deport Marcello or to link him inextricably and concretely to organized crime. Marcello was not singled out for investigation and prosecution. Joseph Hauser's decision to cooperate with the government provided the investigators with a link to several individuals with whom Hauser said he had illicit dealings in the past. Marcello was in that group, and nothing was presented at trial to overcome the presumption that his prosecution was undertaken in good faith.

*Sanctions for Leaks to the Press*

■ Prior to trial, I denied defendants' motion to dismiss the indictment against them on grounds that government-initiated leaks to the news media concerning the Brilab investigation and subsequent grand jury proceedings had prejudiced them. I deferred ruling on the defendants' alternative motion for sanctions and provided the government an opportunity to supplement its proffer of affidavits of officials who participated in the grand jury proceeding. The government subsequently supplemented its response to the defendants' motion for sanctions by filing the affidavits of Wachs, Montague, Harold Hughes and Vincent Coyle, the FBI agents engaged primarily in the local Brilab investigation.[41] Each denied any involvement in leaks of information to the press. I have now reexamined all materials previously submitted to the

**38.** Trial testimony of Harold Hughes under direct examination by defendant Marcello, July 24, 1981, Trial Transcript at 9190, 9198.

**39.** Trial testimony of Michael Wachs under cross-examination by defendant Marcello, May 26, 1981, Trial Transcript at 1678–79.

**40.** Trial testimony of Harold Hughes and William Fleming under direct examination by defendant Marcello, July 24, 1981, Trial Transcript at 9177–82, 9190–98. Marcello's 1961 deportation to Guatemala is described in the district court's opinion in *United States ex rel. Marcello v. District Director etc.*, 472 F.Supp. 1199 (E.D.La.1979), *rev'd*, 634 F.2d 964 (5th Cir.), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981). In reversing the district court and affirming the Board of Immigration Appeals' denial of Marcello's application for suspension of his deportation, the Fifth Circuit said the 1961 deportation to Guatemala "was apparently executed illegally: arguably Marcello was shanghaied to Guatemala without prior notice to him or his attorney by means of a Guatemalan birth certificate that the Immigration and Naturalization Service (INS) may have known was a forgery." 634 F.2d at 966.

**41.** Court Record Document No. 232. The affidavits of other government participants in the investigation are attached as exhibits to Court Record Document No. 131.

court in connection with this motion, including the affidavits of government officials involved in the investigation, the Justice Department's Blumenthal Report, and the newspaper clippings and transcript of a television newscast submitted by the defendants. I have determined based on this review that no further hearings or investigation of the alleged leaks are required and that imposition of sanctions against the government would be inappropriate. Accordingly, the defendants' motion for sanctions is denied.

### Sufficiency of the Evidence

The defendants, particularly Roemer, contend in their post-trial motions that in order to establish a RICO conspiracy, the government must prove beyond a reasonable doubt that the defendant personally and actually agreed to participate in the affairs of an enterprise and to commit two or more predicate crimes as part of his participation in the affairs of that enterprise. Essentially, the argument of each defendant is that the evidence is insufficient to support a finding that each agreed to commit the requisite *two* predicate offenses, specifically because neither agreed to use the mails or interstate telephone facilities in furtherance of the scheme.

In determining these motions for judgments of acquittal on grounds of insufficiency of the evidence, I must view the evidence adduced during this lengthy trial in the light most favorable to the government. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see Burks v. United States*, 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Marx*, 635 F.2d 436, 438 (5th Cir. 1981).

In the Fifth Circuit, the standard for proving the existence of a RICO conspiracy was established in *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.), *cert. denied sub nom. Hawkins v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). In *Elliott* the court recognized that the object of a RICO conspiracy is to commit a substantive RICO offense by conducting or participating in the affairs of an enterprise through a pattern of racketeering activity. The gravamen of the RICO conspiracy charge is not that each defendant agreed to commit each of the separate predicate offenses that demonstrate the pattern of racketeering activity, but that "each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes . . . ." *Id.* at 902. The court said:

> To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise *through the commission of two or more predicate crimes.* One whose agreement with the members of an enterprise did not include this vital element cannot be convicted under the Act.

*Id.* at 903 (emphasis by the court). *Accord: United States v. Phillips*, 664 F.2d 971, 1038 (5th Cir. 1981); *United States v. Sutherland*, 656 F.2d 1181, 1189 (5th Cir. 1981); *United States v. Welch*, 656 F.2d 1039, 1056 n.24 (5th Cir. 1981); *United States v. Martino*, 648 F.2d 367, 383 (5th Cir. 1981); *United States v. Bright*, 630 F.2d 804, 834 (5th Cir. 1980).

Thus, while a substantive RICO charge requires proof of the existence of an enterprise which affects commerce and that the defendant participated in the conduct of the enterprise's affairs by committing at least two of the designated acts of racketeering activity, "[a] RICO conspiracy charge requires the additional element of agreement; . . . the agreement involved in a RICO conspiracy must include the vital element of agreeing to commit the predicate acts." *United States v. Martino, supra,* 648 F.2d at 383. This is not to say, of course, that a RICO conspiracy requires the actual commission of the requisite predicate offenses. No actual acts of racketeering need occur; there need only be an agreement by each defendant to commit two predicate

offenses coupled with some overt act by one of the conspirators in furtherance of the conspiracy. *United States v. Phillips, supra,* 664 F.2d at 1038; *United States v. Sutherland, supra,* 656 F.2d at 1186–87 n.4; *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir. 1981). Such an agreement may be proved by circumstantial evidence. *United States v. Sutherland, supra,* 656 F.2d at 1188.

The defendants concede in their post-trial motions that the evidence, viewed in the light most favorable to the government, establishes an agreement to commit one predicate offense, the bribery of Roemer in violation of Louisiana law,[42] and I agree with this assessment of the evidence. The defendants argue, however, that there was no actual agreement to commit the requisite second predicate offense. Roemer's argument on this point and the government's response raise an important threshhold issue relating to the accuracy and sufficiency of the jury instructions concerning the bribery charged as a predicate offense to the RICO conspiracy in this case.

At various times during the trial and preparation of the instructions to the jury, I discussed with counsel the nature of the bribery charge involving Roemer and heard argument on the subject. The government contended during trial that the Roemer bribery component of the RICO scheme actually constituted three separate bribes and predicate offenses, specifically (1) the payment of $10,000 to Roemer in exchange for obtaining the state employees insurance contract; (2) the payment of an additional $15,000 in exchange for obtaining the same contract; and (3) the payment of a percentage of commissions to Roemer in exchange for maintaining the state insurance contract in place once it had been obtained by the agents. I rejected this argument at trial. The government now contends, however, that because I included in the instructions a reference to Paragraph (E) of Count Two of the indictment[43] in the section of the charge summarizing the forty-two page indictment for the jury, the instructions in fact allowed the jury to find an agreement to commit three separate briberies, and therefore three predicate offenses, as part of the Roemer transaction. The defendants argue in their post-trial memoranda that during preparation of the jury instructions I had agreed with their characterization of the transaction as a single offense.

I disagree with the government's contention that the instructions allowed the jury to find three separate predicate offenses in the Roemer bribery transaction. During the trial I agreed with the defendants that the Roemer bribery constituted only one predicate offense, and the jury instructions, examined and understood as a whole, reflect that view. The view of the Roemer transaction reflected in the jury instructions was based on my interpretation of the Louisiana bribery statute, La.Rev.Stat.Ann. § 14:118 (West Supp.1980), in light of the published Louisiana Supreme Court jurisprudence available at the time of trial, *State v. Ponthier,* 391 So.2d 1138 (La. 1980),[44] and the evidence adduced during

---

**42.** *See* Roemer's Memorandum in Support of his Post-trial Motion for a Judgment of Acquittal or, Alternatively, for a New Trial, Court Record Document No. 548, at 2.

**43.** Paragraph (E) of Count Two of the superseding indictment, Court Record Document No. 56, at 17–18, was a two-page chronological listing and description of the specific acts which the indictment alleged and the government contended constituted bribery in violation of Louisiana law.

**44.** After the jury instructions in the Brilab case were given and the verdicts rendered, two additional cases relevant to the issue of the number of bribery offenses included in the Roemer-Marcello transaction were published. In *Unit-*

*ed States v. Colacurcio,* 659 F.2d 684 (5th Cir. 1981), decided almost three months after the Brilab verdicts were returned, and *State v. Hebert,* 402 So.2d 675 (La.1981), decided on June 22, 1981 but not published until after a motion for rehearing had been denied in September 1981, the courts recognized that a series of payments made, not to influence a single act of official conduct, but to provide continuing protection or influence over a period of time, could be considered separate bribes and separate offenses. These decisions arguably would allow the Roemer-Marcello transaction to be considered as at least two separate bribes consisting of (1) the payment of $25,000 cash in "upfront" money, albeit in two separate installments, in exchange for obtaining the insurance

the proceedings. The statute and the *Ponthier* case define bribery in violation of Louisiana law in terms of specific intent to influence official conduct rather than in terms of amounts or installments of money paid to gain that influence. At trial, I concluded that the payments offered to or accepted by Roemer constituted a single bribery offense, and therefore a single predicate crime for RICO purposes, because each payment or promise to pay was made to influence only the single official act of obtaining the state employees insurance contract for the agents.

In determining the sufficiency of the jury instructions on this threshhold point, I must examine the entire charge, viewing it as a whole. *See Davis v. McCallister*, 631 F.2d 1256, 1260 (5th Cir. 1980), *cert. denied*, 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981); *United States v. Abravaya*, 616 F.2d 250, 251 (5th Cir. 1980); *United States v. Diecidue*, 603 F.2d 535, 548 (5th Cir. 1979), *cert. denied sub nom. Antone v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980); *United States v. Fontenot*, 483 F.2d 315, 322 (5th Cir. 1973). In this case, the construction of the charge itself and a reading of the charge as a whole demonstrate that the jury was instructed that the Roemer transaction could comprise only one predicate offense. The instructions contain two references to the predicate offenses comprising the "pattern of racketeering activity" charged against the defendants. The first, upon which the government relies for its argument, is a general reference appearing in a portion of the charge linking the acts alleged in the indictment to an explanation of the term "pattern of racketeering activity." The instruction states:

The pattern of racketeering activity charged in Count Two includes public bribery in violation of Louisiana law as listed in Paragraph (E) of Count Two; and interstate travel in aid of unlawful activity, wire fraud, and mail fraud in violation of provisions of the United States Code as charged in Counts Three through Twelve of the indictment.[45]

The reference to Paragraph (E) of Count Two of the indictment is a general reference applying to all defendants that was added to the instructions shortly before the close of the case at the government's request without objection by the defendants. No attempt was made at this point in the instructions to distinguish among defendants or to enumerate specifically which particular predicate offenses were to be considered as to individual defendants.

A specific enumeration of the particular RICO predicate offenses to be considered against each defendant was contained later in the charge.[46] Where the law and evidence supported an instruction on more than one bribery offense by a defendant, the jury was instructed accordingly. Thus, the instructions concerning the predicate offenses to be considered against Marcello, Davidson, and Marinello described two separate bribery offenses against each—the separate briberies of Roemer and then-Lieutenant Governor James E. Fitzmorris, Jr. The instructions concerning Roemer, in contrast, describe only a single act of public bribery in addition to the mail and wire fraud offenses charged against him:

Defendant Charles E. Roemer, II, is charged with committing public bribery by accepting money in exchange for use

---

contract for the agents, and (2) the payment of a monthly commission to Roemer in exchange for exercising his influence to maintain the contract in place. In light of my conclusion, however, that the jury instructions allowed the jury to consider the Roemer-Marcello transaction as only a single bribery and, therefore, a single predicate offense for RICO purposes, *see* text at pages 1380–82, I find it unnecessary to address the effect of these two recently pub-

lished decisions on my previously expressed view of the transaction since the defendants suffered no prejudice, and in fact benefitted, from jury instructions that treated the transaction only as a single bribery offense.

**45.** Jury Instructions, Court Record Document No. 438, at 22.

**46.** *Id.* at 33 35.

of his official position and influence to obtain insurance contracts; . . . .[47]

This view of the instructions is particularly reflected when the instructions concerning Roemer are read in context and together with those concerning the other defendants, whose dealings with Roemer were described in the same section of the instructions as a single bribery separate from the second alleged bribery offense relating to their dealings with Fitzmorris. The earlier reference in the instructions to Paragraph (E) of Count Two of the indictment in no way affected the overall import of the specific instructions contained later in the charge on what and how many predicate acts had been alleged against each defendant.

■ Accordingly, I conclude that the charge allowed the jury to consider the Roemer-Marcello bribery transaction as only a single predicate offense for RICO purposes. I therefore must determine whether the evidence presented at trial was sufficient to support a jury finding that, in addition to the Roemer-Marcello bribery, the defendants agreed to commit one or more additional predicate offenses of mail or wire fraud. The parties disagree, as a threshhold matter, about whether it was necessary for the government to prove an agreement by the defendants actually to use the mails or to use interstate wire facilities in furtherance of their scheme to satisfy the agreement requirement of a RICO conspiracy offense. As to the mail fraud predicate offense, for example, the defendants argue that the Fifth Circuit's standards established in mail fraud conspiracy cases are applicable here. While some courts have rejected the view that actual agreement to use the mails is required to prove a mail fraud conspiracy, see *United States v. Craig*, 573 F.2d 455, 485 (7th Cir. 1977), cert. denied, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978); *United States v. Mauro*, 501 F.2d 45, 51 (2d Cir.), cert. denied, 419 U.S. 969, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974), the Fifth Circuit has stated that "the basis for the offense of conspiracy to commit mail fraud is an agreement to use the mails to defraud." *United States v. Kent*, 608 F.2d 542, 547 (5th Cir. 1979), citing *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). The defendants therefore contend that the government was required to prove an agreement actually to use the mails or interstate wire facilities in order to support the RICO conspiracy convictions. The government, on the other hand, argues that no such agreement actually to use the mails or interstate wire facilities was required as long as it proved an intent and agreement to defraud and subsequent use of the mails or interstate wire facilities in furtherance of the scheme.

I find it unnecessary at this time to choose between the alternative theories advanced by the parties because, even applying the higher standard of proof advanced by the defendants, I conclude that there was ample evidence, when viewed in the light most favorable to the government, to support a finding that both defendants actually agreed to use the mail and interstate telephone calls as part of their agreement to commit two or more predicate offenses in the RICO conspiracy.[48]

Several circumstances, viewed in combination, support this conclusion. Both Marcello and Roemer knew from the outset of their dealings with Hauser and the agents

---

**47.** *Id.* at 35.

**48.** The defendants have argued, citing *United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 48 (1977), that if there is insufficient evidence to support *either* an agreement to commit mail fraud *or* an agreement to commit wire fraud as the requisite additional predicate offense, the RICO conviction cannot stand since the jury's verdict does not specifically reflect which two or more predicate offenses the defendants were found to have agreed to commit. The Fifth Circuit has not expressly embraced the viewpoint expressed by the Third Circuit in *Dansker.* See *United States v. Peacock*, 654 F.2d 339, 348 (5th Cir. 1981). Because I find sufficient evidence to support agreement by the defendants to commit *both* mail and wire fraud, I find it unnecessary to address the issues raised by the defendants' assertion of the *Dansker* point-of-view and the government's opposition to those assertions.

that their operation was based in California. Hauser and the agents kept the defendants apprised, often at the defendants' requests, of their travel plans and schedule. The scheme in which the defendants were involved was broad in scope, concerning a large-scale change in a substantial state employees insurance program. Effecting such a change required the defendants to engage in ongoing discussions, meetings, and the exchange of information and proposals with Hauser and the agents. The nature of the plan to obtain the state insurance contract and the fact that the defendants knew the Hauser group was based cross-country indicate that the defendants contemplated the use of the mail and interstate phone calls which occurred in furtherance of the scheme. Certainly, Marcello's agreement to use interstate phone calls in furtherance of the scheme can be gleaned from his September 21, 1979 call to Hauser in which he scheduled a meeting of Roemer, Hauser and the agents.[49] Roemer's agreement to the September 21 call may be inferred from the fact that he had met with Marcello earlier that day at the St. Ann Hotel in New Orleans, agreed to meet with Hauser and the agents, and, in effect, authorized Marcello to arrange the meeting. The evidence further indicates that both Marcello and Roemer wanted Hauser and the agents to provide Roemer with a written proposal concerning the insurance program. On several occasions they asked for such a proposal and encouraged the government agents to prepare it for Roemer's use in obtaining the contract on their behalf.[50] On November 2, 1979, the same day Hauser's written proposal was mailed to Roemer, Marcello and Roemer engaged in a telephone conversation which, viewed against the background of their often-expressed desire for such a proposal and their knowledge of Hauser's operation and the nature of the scheme in which they were involved, indicates their assent and agreement to that specific mailing in furtherance of the plan to obtain the state employees insurance contract:

Roemer: Listen, uh. Have you talked to those fellows out ... Cal ...

Marcello: Yeah, they been talkin' to me, man. Everyday, I talk to 'em, but ya know, I said well let me call. I know you have been so damn busy, ya know.

Roemer: Well, I ...

Marcello: I said well I don't know what the man doin'. I said but I'm a find out.

Roemer: Well I have been doin' my thing. Gettin' closer and closer to their thing, but I need to hear. I need to see somethin', what their proposal is.

Marcello: Well they got a proposal. They save, savin' uh little over a million dollars man.

Roemer: What do I need to do?

Marcello: Well ...

Roemer: How do I get with 'em?

Marcello: He get the, I believe he mailed ya a letter yesterday.

Roemer: *Okay. That's good then.*

Marcello: Mailed ya a letter yesterday. Ya oughta have it probably Monday mornin'.

Roemer: Well I've laid all the ground work for it and it all looks good right now.

Marcello: Looks good?

Roemer: Yeah. Looks good.

Marcello: Well all right. Cause they're ready.

Roemer: Okay.

Marcello: They're ready. Aggravating me, ya know?

Roemer: Yeah.

Marcello: All right so. You get that letter Monday, give me a uh a call, or tell Aubrey to call me.

Roemer: All right. All right.[51]

---

**49.** Government exhibit 71–T, government transcript at 1–4.

**50.** *See, e.g.,* portions of transcripts of tape-recorded conversations quoted in text at notes 31–35 *supra.*

**51.** Government exhibit 110–T, government transcript at 31–32 (emphasis added).

Thus, the evidence viewed as a whole and in the light most favorable to the government reveals a transaction in which discussions and the exchange of information between individuals in different locations were essential, and shows not only the expectation that the mail and interstate phone calls would be used to further the scheme, but also the defendants' assent and approval of the use of those means of effecting the plan. I conclude, therefore, that the government presented sufficient evidence to support the jury's verdict finding Marcello and Roemer guilty of a RICO conspiracy because the evidence shows that the defendants objectively manifested an agreement to commit two or more predicate offenses.

*Insufficiency of the Jury Instructions*

■ The defendants argue in their post-trial motions that my instructions to the jury were deficient in several respects. In examining the defendants' objections to the jury instructions, I must determine whether the entire charge, taken as a whole, adequately presented the issues and the law to the jury. *United States v. Diecedue, supra*, 603 F.2d at 548; *United States v. Abravaya, supra*, 616 F.2d at 251. Specific instructions to a jury "may not be judged in artificial isolation, but must be viewed in the context of the overall charge," *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), and the charge's correctness is measured not by isolated passages but in light of the charge as a whole. *United States v. Rouse*, 452 F.2d 311, 314 (5th Cir. 1971).

■ The defendants argue that the jury instructions on the "agreement" element of the RICO conspiracy offense failed adequately to articulate the specifics of an agreement to commit the particular predicate offenses charged. Instructions concerning the agreement aspect of the RICO conspiracy were set out in several portions of the charge. The jury was instructed in general terms that a conspiracy is "a combination or agreement of two or more persons to join together to attempt to accomplish some unlawful purpose" and "a combination or mutual agreement by two or more persons to disobey or disregard the law." [52] In language derived from the Fifth Circuit's leading RICO conspiracy decision, *United States v. Elliott, supra*, the instructions explained that an essential element of the offense which the government must prove beyond a reasonable doubt is that each defendant "willfully became a member of the conspiracy by objectively manifesting, through his words or actions, an agreement to participate, directly or indirectly, in the affairs of the enterprise through the commission of two or more offenses that comprise a pattern of racketeering activity." [53] Later in the charge, the jury was specifically instructed on the particular predicate offenses with which each defendant was charged.[54] The structure and substance of the RICO conspiracy charge used in the instant case were essentially the same as those used by the district court and approved by the Fifth Circuit in *United States v. Bright*, 630 F.2d 804, 821–23 (5th Cir. 1980). I find that, viewed as a whole, the jury was adequately apprised of the issues and law applicable to the "agreement" element of the RICO conspiracy of which these defendants were convicted.

■ The defendants also contend that the jury instructions concerning the requirement that the activities of the enterprise must affect interstate commerce were erroneous. As to the interstate commerce element of the RICO offenses alleged in the indictment, the jury was instructed as follows:

With respect to the requirement that the "enterprise" was engaged in, or that its activities affected, interstate commerce the government contends that in conducting the affairs of the enterprise the defendants made or caused to be made interstate telephone calls and that

---

**52.** Jury Instructions, Court Record Document No. 438, at 17.

**53.** *Id.* at 18-19.

**54.** *Id.* at 33–35.

the defendants Marcello and Davidson travelled or caused travel from one state to another in aid of unlawful activity.

If you find beyond a reasonable doubt that these transactions or events occurred, and that they occurred in or as a direct result of the conduct of the affairs of the alleged enterprise, the requisite effect upon interstate commerce has been established. If you do not so find, the requisite effect upon interstate commerce has not been established.[55]

This instruction was based on the Fifth Circuit's decision in *United States v. Malatesta*, 583 F.2d 748, 754–56 (5th Cir. 1978), *rehearing en banc* 590 F.2d 1379 (5th Cir.), *cert. denied sub nom Bertolotti v. United States*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979), and the Fifth Circuit's Pattern Jury Instructions for Criminal Cases. In *Malatesta*, the court found that interstate telephone calls made as part of the conduct of the affairs of a RICO enterprise were alone sufficient to satisfy the RICO requirement of an effect on interstate commerce. The view expressed in *Malatesta* is consistent with the decisions of other courts that, although an effect on commerce is an essential element of a RICO offense, the required nexus is not great and a minimal effect on interstate commerce satisfies the jurisdictional element. *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir. 1981); *United States v. Barton*, 647 F.2d 224, 233 (2d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). Unpersuaded by the defendants' attempts to distinguish *Malatesta* and convinced that *Malatesta* establishes controlling precedent on this point, I find the defendants' objections to the jury instructions concerning the interstate commerce element of the RICO offense without merit.

*Elements of the RICO Offense: Insufficiency of the Pattern and the Enterprise*

■ The heart of a RICO offense is the conduct of the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c); *United States v. Phil-*

*lips, supra*, 664 F.2d at 1011; *United States v. Elliott, supra*, 571 F.2d at 899 n.23. RICO does not criminalize either associating as an enterprise or engaging in a pattern of racketeering activity standing alone; both elements are essential to commission and conviction of a RICO substantive or conspiracy offense. *United States v. Turkette*, 452 U.S. 476, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981); *United States v. Phillips, supra*, 664 F.2d at 1011–13. In the instant case, the defendants argue that the government has failed to prove either a sufficient "pattern" of racketeering activity as described by the jurisprudence interpreting RICO or the existence of an enterprise separate from whatever predicate offenses may have been committed.

The defendants contend essentially that the pattern of racketeering activity charged in this case, in light of the evidence presented at trial, is insufficient for RICO purposes because the mail and wire fraud acts charged as predicate offenses in addition to the Marcello-Roemer bribery transaction were merely manifestations and part of the single state bribery scheme. Since the mail and wire fraud predicate offenses are intertwined with the state bribery scheme, the defendants argue that no adequate "pattern" of separate offenses within the meaning of RICO has been established. I agree with the defendants that the evidence clearly showed that every act charged as a predicate offense against these defendants was related to a single scheme to obtain the state employees insurance contract. For example, the bribery of Roemer, the September 11, 1979 telephone call in which Marcello arranged a meeting between Roemer and the agents, and the November 2, 1979 mailing of the written proposal from the agents to Roemer all were done in furtherance of a single plan to obtain the state contract. The jurisprudence of the Fifth Circuit, however, applies RICO broadly— broadly enough, in fact, to include within the term "pattern of racketeering activity" several distinct offenses which all arise from the same criminal scheme.

---

**55.** *Id.* at 36.

 In orally denying defendants' post-trial motions on this point, I relied principally on the Fifth Circuit's broad application of RICO to the fact situation presented in *United States v. Martino, supra,* in which mail fraud offenses arising from an arson and fire insurance fraud scheme were used as predicate offenses for RICO convictions. Since my oral ruling, the Fifth Circuit has made clear that several predicate offenses arising from a single criminal scheme may constitute a pattern of racketeering activity for RICO purposes. In *United States v. Phillips, supra,* the court reiterated that the predicate acts necessary for finding a pattern of racketeering activity must be two separate crimes. "These crimes need not, however, be in the context of independent schemes or objectives." *Id.* at 1038. The court found that a defendant could be validly convicted of a RICO conspiracy, even though the conspiracy had a single criminal objective, "so long as (the defendant) committed or agreed to commit at least two separate crimes in furtherance of the conspiracy's single objective." *Id.* at 1039. Thus, while the mail and wire fraud offenses which serve as additional predicate offenses for the pattern of racketeering activity in the Brilab case were indeed related to the state bribery scheme which comprised the initial predicate offense, they were separate offenses for purposes of establishing a RICO pattern of racketeering activity.

The defendants' assertion that the government failed to prove the existence of an enterprise separate from the mere commission of the predicate offenses is also without merit. The term "enterprise" is broadly defined by the RICO statute itself as any individual or group of individuals *associated in fact* although not a legal entity. 18 U.S.C. § 1961(4) (emphasis added). In *United States v. Turkette, supra,* the Supreme Court afforded the term "enterprise" a broad interpretation consistent with the clear language of the statute itself. The Court said an enterprise may consist of "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v.*

*Turkette, supra,* 101 S.Ct. at 2528. The existence of a RICO enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* The Court noted that the "enterprise" is not the "pattern of racketeering activity" and that proof of one does not necessarily establish the other. *Id.*

 In this case, the government amply proved an agreement to participate in an enterprise separate and apart from the mere commission or agreement to commit acts of racketeering activity. Marcello and Roemer directly discussed the arrangements for obtaining the state employees insurance contract, as well as the political machinations indirectly related to their plan, and other matters on several occasions. They arranged meetings, exchanged ideas, and made plans between themselves, with others, and through intermediaries. The government proved an association in fact between these two individuals, and an agreement to associate together, that fits within the broad definition of "enterprise" provided by the RICO statute and by the jurisprudence interpreting it.

### Conclusion

The Brilab investigation in Louisiana, and the resulting criminal indictments and trial, have produced two convictions and a voluminous record of pleadings, documents, judicial decisions, and evidence, all of which undoubtedly will be reviewed again by other judges and courts. The legal and factual contentions asserted by the defendants for the most part raise serious and in some respects significant questions of law, policy, and priorities. In my view, however, the verdicts of the jury, whose service and attentiveness through eighteen arduous weeks of trial deserve particular commendation, are supported by the law and the evidence. Accordingly, the defendants' motions to dismiss the indictment and for entry of judgments of acquittal or for a new trial must be denied in all respects.